Vernon C. WILLIAMS, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CF–278.

District of Columbia Court of Appeals.

Argued May 18, 2004.

Decided Sept. 16, 2004.

Veronice A. Holt, appointed by the court, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, John R. Fisher and Cynthia G. Wright, Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB, Associate Judge, STEADMAN, Associate Judge, Retired,* and NEBEKER, Senior Judge.

_____

* Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on August 8, 2004.

NEBEKER, Senior Judge:

Appellant Vernon Williams appeals his conviction after trial by jury for two counts of first degree sexual abuse and two counts of second degree sexual abuse in violation of D.C.Code §§ 22–4108, –4109 (1981). Williams challenges the competence of the complainant, H.T., to testify, allowing H.T. to testify outside the courtroom and appellant's presence, use of a videotape statement of H.T. to a counselor as evidence, permitting limited government contact with H.T. over the course of her testimony, admission of an excited utterance, sufficiency of the evidence, and a fair trial issue respecting the prosecutor's closing argument. Each contention was preserved at trial. For the reasons stated herein, we affirm the convictions.

## FACTS AND PROCEDURAL HISTORY

Facts adduced at trial established that, during 1999 and 2000, Williams sexually abused H.T., the daughter of his girlfriend, who was three and four years old at the time of the offenses.[1] H.T., her mother, and Williams lived together in two different apartments during the time in question, moving into the second, larger apartment in March of 1999. Williams is the father of three other children with H.T.'s mother, all of whom are younger than H.T. H.T. referred to Williams as "Daddy" and he played an active role in her life.

In February 2000, H.T. revealed what she called her "secret" to her grandmother, informing her that Williams had been "bad" and had touched her in a sexual manner. H.T.'s mother and grandmother took her to Children's National Medical Center, where H.T. explained to a physi-

1. H.T. was born on June 22, 1995.

cian in greater detail what Williams had done. At the time of revealing these events, H.T. exhibited a stutter and other nervous behavior. The examination did not reveal any trauma.

At trial, which began a few months after H.T. turned five, the court agreed to allow the prosecutor to conduct a competency hearing as the initial part of the direct examination. After voir dire by the prosecutor and defense counsel before the jury, the court determined that H.T. was competent to testify. H.T. then testified that something "yucky" happened to her in her apartment, and she was able to identify male and female genitalia on an illustrative diagram, but as the prosecutor turned to questioning her about what Williams had done to her, H.T. consistently testified that she did not know. The trial judge granted a brief recess and when court reconvened the prosecutor revealed that H.T. was crying and that the prosecutor had called for a Child Advocacy Center counselor to come and help calm H.T. down. Upon taking the stand again, H.T. continued to be unable to testify about the events but did say that Williams had told her not to reveal what had happened to her mother.

After the trial court excused H.T. for the day, the prosecutor, on the theory that Williams' presence was inhibiting H.T., then proposed, pursuant to *Hicks–Bey v. United States*, 649 A.2d 569 (D.C.1994), to continue H.T.'s testimony by way of closed circuit television in the jury room. The prosecutor asked that if isolating H.T. from Williams did not facilitate her ability to testify, then the prosecutor be allowed to impeach her with videotaped statements H.T. had made to a child advocacy counselor describing the abuse (hereafter, the "CAC videotape"). After hearing arguments on this issue, the following day the trial court agreed to take expert testimony from Ashlea Staunch, a clinical social worker at the Children's Advocacy Center. That testimony was about whether it would be traumatic to continue H.T.'s testimony in Williams' presence.

Staunch testified that she had diagnosed H.T. with post-traumatic stress disorder. When Staunch attended to H.T. in the witness room H.T. "appeared to me completely distressed and overwhelmed" and that "it seemed to me that she was re-experiencing her past as if it were the present." She noted that H.T. appeared not to want to go back into the courtroom and that, when she did return, "she was trying to avoid painful material." Staunch noted that symptoms of stress included stuttering, yawning, and avoidance. She concluded that it would be traumatic for H.T. to continue to testify in Williams' presence and that she thought "that the presence of the Defendant is—causes—is a trigger to very painful material that overwhelms her" and that this was cumulative to the stress she experienced simply as a result of testifying.

Based on Ms. Staunch's testimony, the court agreed to proceed with additional voir dire of the child in the jury room, outside the presence of Williams, in order to determine the impact of Williams' presence. A video camera recorded H.T.'s testimony while an audio link was provided between the courtroom and the jury room which allowed the judge to monitor and participate in the questioning. Present in the jury room were H.T., Ms. Staunch, the prosecutor, counsel for Williams, the court reporter and an audio-visual technician. The voir dire began on the afternoon of Friday, July 28, but H.T. was unresponsive despite Ms. Staunch's attempts to relieve her stress and provide reassurances. The court recessed for the weekend, giving the parties time to brief the issue of whether or not the prosecutor would be allowed to impeach H.T. with the CAC videotape.

On Tuesday, August 1, the trial resumed. The session in the jury room proved unproductive, however, with H.T. continuing to respond that she forgot or did not know the answer to pertinent questions. H.T. did state, however, that Williams had put his "tail" on her "coochie" and that that made her "sad."

The prosecutor then began to impeach H.T. by playing portions of the CAC videotape statement and then asking H.T. questions about what they had just viewed. As a result of the impeachment, H.T. testified that Williams had licked her "butt," that he had touched her "coochie" and that he had licked her "coochie." Finally, after being shown a portion of the videotape when she had described Williams "pee"ing in her mouth, H.T. then testified that she had been "laying down," that the "pee" tasted "bad," and that she had spat it out.

The jury later viewed the videotape of H.T.'s testimony taken on both Friday, July 28, and Tuesday, August 1. The court admitted the portions of the CAC videotape used to impeach H.T., noting that H.T. had "essentially adopted" statements made therein. The court noted that those portions of the tape admitted could be used by the jury as substantive evidence "to the extent that the jury finds that she adopted" them.

After the completion of H.T.'s testimony, the prosecution sought to introduce evidence establishing that Williams had sexually assaulted An.J., a two-year-old girl, in 1991. The prosecution had filed a notice of intent to introduce "other crimes" evidence prior to trial in order to prove that Williams had an "unusual sexual preference," pursuant to *Dyson v. United States*, 97 A.2d 135 (D.C.1953). Rather than introduce the evidence through testimony of the child witness, who apparently had been determined incompetent to testify in charges brought after the 1991 offense, the

child's mother testified about what the child had told her as an excited utterance exception to the prohibition against hearsay.

After presentation of the remainder of the evidence, the jury returned a verdict finding Williams guilty of two counts of first degree child sexual abuse and two counts of second degree child sexual abuse. D.C.Code §§ 22–4108, –4109 (1996 Repl.).

## ANALYSIS

### I. Competency

 Williams argues that the trial court's determination that H.T. was competent to testify was clearly erroneous. The determination of competency rests within the trial court's discretion, *Galindo v. United States*, 630 A.2d 202, 206 (D.C. 1993), and is based on whether the child in question satisfies three criteria: "(1) (s)he is able to recall the events about which (s)he is to testify, (2) (s)he understands the difference between the truth and a falsehood, and (3) (s)he appreciates the duty to tell the truth." *Howard v. United States*, 663 A.2d 524, 530 (D.C.1995) (citing *Galindo, supra*, at 206–07).

Williams argues that H.T. was neither able to recall the events about which she was to testify nor did she appreciate the duty to tell the truth. Although H.T.'s initial testimony was that she did not remember what had happened, Ms. Staunch testified, and the court agreed, that this inability to recall was indicative of stress. After being impeached by the prosecutor, H.T. was able to give limited testimony about the offenses charged.

Also, voir dire of H.T. demonstrated she understood the difference between truth and falsehood and that she understood the duty to tell the truth. H.T. testified that she understood that "[t]he first rule in the courtroom is that you always tell the

truth." When asked what would happen if she told a lie, H.T. responded that "[t]he judge will punish me." She also agreed with the prosecutor that it would be a bad thing if she lied. Williams rests his argument that H.T. did not appreciate the duty to tell the truth on her negative response to the question, "[i]f you tell a lie, do you think something bad could happen to somebody else?" Williams cites no precedent, nor are we aware of any, that supports this proposition. We cannot say, therefore, that the trial court's exercise of its discretion when it found H.T. to be competent is reversible error.

## II. *Hicks–Bey* Testimony

■ Williams presents several arguments in relation to the court's decision to allow H.T. to testify via closed circuit television pursuant to *Hicks–Bey, supra.* The Supreme Court of the United States has outlined three requirements the trial court must find in order to allow a witness to testify outside the presence of a criminal defendant: (1) that the "use of the one-way closed circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify"; (2) "that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant"; and (3) "that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis, i.e.,* 'more than mere nervousness or excitement or some reluctance to testify.'" *Maryland v. Craig,* 497 U.S. 836, 855–56, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) (citations omitted); *accord Hicks–Bey, supra,* 649 A.2d at 574. We note that "the trial court has inherent authority ... to control the conduct of the proceedings before it, in order to ensure that the proper decorum and appropriate atmosphere are established, that all parties are treated fairly, and that justice is

done." *Hicks–Bey, supra,* at 575 (citing *Guaranty Dev. Co. v. Liberstein,* 83 A.2d 669, 671 (D.C.1951)).

### A. Whether the Testimony Was Permissible

■ Williams argues that the second *Craig* requirement was not met because H.T. demonstrated no fear of testifying in his presence. As evidence to support this contention, Williams directs our attention to the first day of H.T.'s testimony, when she pointed to him and waved and smiled at him when she entered the courtroom. The record shows, however, that once the prosecutor began to question H.T. about appellant's conduct toward her, H.T. would not respond. Shortly afterward, during a recess in the proceedings, H.T. broke down and cried in the witness room. Ms. Staunch testified that H.T. told her she refused to answer because she was "so scared" of Williams. The prosecutor relayed that H.T. "would testify if the Defendant was not present. She can say the words. She just doesn't want to say it in front of [Williams]." Staunch also testified that "the courtroom ... is stressful, but the presence of the Defendant makes the environment unmanageable." Staunch noted that H.T. experienced Williams' presence as a threat to her.

Although the trial judge failed to make specific factual findings as to the three requirements, the record amply supports an implicit determination by the trial judge that H.T. feared Williams, so that an attempt to take her testimony by way of closed circuit television was warranted. We note that this matter had been briefed for the trial court. It is apparent on the record that the trial judge wished to proceed with a limited voir dire with H.T. in the jury room in order to determine whether testifying in that manner was even feasible for the child. Once the court

realized it was not, it decided to accommodate the prosecutor's strategy to proceed by impeaching H.T., the validity of which we discuss below. Thus, Williams fails to show that the trial court abused its prerogative to govern the conduct of the trial by proceeding with testimony taken via closed circuit television. The judge did note that "[t]he testimony I thought was pretty clear that testifying in the presence of the Defendant was traumatic and did add to her difficulty." Thus, the second *Craig* requirement is satisfied.

### B. Timing of the Testimony

■ Williams argues that the trial court erred when it instituted the *Hicks–Bey* proceedings during the trial and *after* H.T. had already begun her testimony. Williams argues that the prosecutor was aware "that her witness would shut down when asked about the charged conduct" because she had done so during the grand jury proceedings. According to Williams, the prosecutor proceeded with voir dire of H.T. knowing that she would be incapable of going forward and thereby invoking to the jury the specter of H.T.'s fear of Williams before impeaching her with the CAC videotape.

The question of whether a trial court may begin *Hicks–Bey* proceedings after first attempting to get testimony in the courtroom is one that has received scant attention in this court. While it is true, as Williams notes, that *Hicks–Bey* involved use of closed-circuit television testimony prior to trial, nothing in that decision, nor in *Craig*, upon which *Hicks–Bey* relied, turned on the timing of the proceeding. To be sure, a *Hicks–Bey* proceeding is extraordinary, as the criteria for its use reveal. But the unsuccessful attempt to

get courtroom testimony is added assurance that the welfare of the child permitted, if not compelled, the remote testimony. Moreover, by beginning the testimony in the courtroom in Williams' presence, the trial court at least attempted to afford usual trial confrontation before deciding to see whether the *Hicks–Bey* criteria were met. Finally, the conduct of a trial is left to the sound discretion of the trial judge, *Hicks–Bey, supra,* and that exercise of that discretion was not in error.

### C. The Videotape

■ Williams argues that the trial court abused its discretion by allowing H.T.'s testimony to be videotaped and then played to the jury, rather than showing the jury the live closed circuit testimony. H.T.'s testimony was replayed because the trial court took the testimony directly after conducting a limited voir dire in the jury room. The court proceeded in this manner in order to accommodate H.T.'s limited energy and attention span. By using the taped testimony, the court ensured that H.T.'s actual testimony could be taken in as compressed an amount of time as possible, without having to delay her while the jury were brought in after voir dire was completed and her substantive testimony began.

Williams cites no precedent, nor are we aware of any, that forbids this procedure, nor does he argue with any specificity that he was prejudiced.[2] Indeed, we agree with the trial court that there was no meaningful difference between the jury watching the video and the watching the testimony live, particularly under these circumstances.

---

2. Williams suggests that the prosecutor wanted to be able to repeat her questions until she "got the results desire" [sic], but does not

refer to any part of the record to substantiate this.

### III. CAC Videotape

Williams argues that H.T. never adopted her CAC videotape statement and that therefore the trial court erred when it admitted the tape as substantive evidence. It is a well settled rule that "[w]hen a witness testifies under oath and adopts a prior statement not made under oath, that prior statement becomes substantive evidence." *Mercer v. United States,* 724 A.2d 1176, 1195 (D.C.1999) (citations omitted). This rule is related to, but distinct from, our statutory scheme permitting the use of a prior inconsistent statement as substantive evidence at trial when the statement was made under oath and the declarant is available for cross-examination concerning the prior statement. D.C.Code § 14-102(b) (2001).

The CAC videotape contained statements made while H.T. was not under oath. Because H.T. testified, after being impeached with the CAC videotape, that Williams had in fact done what the record reveals, she adopted those portions of the CAC video used to impeach her. Therefore, the trial court did not err in allowing the jury to consider the adopted statements for their truth. *Mercer, supra.*

Williams also argues that the trial judge erred when he instructed the jury to consider whether or not H.T. had adopted the CAC videotape excerpts. Even assuming error, Williams does not show that he was impermissibly prejudiced in any way; having established that the statements were adopted, a conclusion we sustain, the fact that the jury could have reconsidered whether adoption occurred or not only stood to benefit Williams.

### IV. Witness Contact

Williams next argues that the trial court abused its discretion when it refused to prohibit contact between the government and H.T. over the course of her testimony. As the Supreme Court has noted:

It is a common practice for a judge to instruct a witness not to discuss his or her testimony with third parties until the trial is completed. Such nondiscussion orders are a corollary of the broader rule that witnesses may be sequestered to lessen the danger that their testimony will be influenced by hearing what other witnesses have to say, and to increase the likelihood that they will confine themselves to truthful statements based on their own recollections.

*Perry v. Leeke,* 488 U.S. 272, 281–82, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989) (footnotes and citations omitted). Such matters are left to the discretion of the trial court. *See, e.g., Johnson v. District of Columbia,* 655 A.2d 316, 317 (D.C.1995); *Garmon v. United States,* 684 A.2d 327, 328 (D.C.1996).

Williams requested that the government be "admonished" from speaking to H.T. during the first recess of H.T.'s first day of testimony. The court responded that the warning was not necessary. At the end of that day, upon learning that H.T. would stay at the CAC overnight, Williams requested that the prosecutor should not have any contact with her during that time to prepare her for additional testimony. The prosecutor responded that she did not mean to talk to H.T. about the substance of her testimony, but rather to ensure that she would come on time, and that Ms. Staunch could talk to H.T. and try and determine whether or not she would in fact be able to testify.

At the end of proceedings the following day, Williams again asked that the government be directed to tell anyone who would have contact with H.T. over the weekend not to discuss her testimony. The trial judge responded:

I think it's obviously inappropriate to discuss the testimony directly.... I don't think I'm going to be more formal than that.... [The prosecutor] may want to make sure that others around don't—that they're alert to the need to remain professional and not—[ ] get frustrated and caught up in the frustration of the circumstances—[ ] and step over any professional lines.

We find ample evidence of the trial court's prudence in this statement, and the prosecutor responded that she was willing to comply with the court's terms. To the extent that Williams sought to separate H.T. from Ms. Staunch, we cannot say that the trial court was required to provide a more stringent prohibition than it did. The trial court was fully justified in not separating a five year old child from the CAC counselor who was treating her.

In an attempt to show the prejudicial impact upon him resulting from the trial court's failure to make a more formal warning, Williams notes that Ms. Staunch subsequently testified that "I asked her if it was difficult to talk about what had happened in front of him, and she said yes. Then I said 'Would it be easier if he weren't there?' and she said yes." This interaction appears geared toward Ms. Staunch's counseling of H.T., and not designed to shape her testimony. Ms. Staunch's testimony was elicited while the court evaluated whether to proceed with the *Hicks–Bey* testimony and does not appear to have had an effect on H.T.'s testimony anyway—particularly in recognition of the fact that, despite continuing to work with Ms. Staunch, H.T. was not able to testify at any great detail even outside of Williams's presence until impeached with the CAC videotape.

## V. Excited Utterance

 Williams argues that the trial court abused its discretion when it admitted other crimes evidence as an excited utterance exception to the prohibition against hearsay. The events constituting the other crimes evidence occurred in 1991 when Williams was arrested for allegedly sexually assaulting An.J., the two year old child of a neighbor. Because the prosecutor did not intend to call An.J. to testify, she offered the evidence through testimony of An.J.'s mother, to whom An.J. had reported the incident. Williams objected to the proposed testimony on the ground that it should be introduced through An.J., that An.J.'s competency needed to be tested, that it included an identification that was not admissible, and that it was highly prejudicial. After further argument, the trial court decided to take voir dire testimony of An.J.'s mother, outside the presence of the jury in order to make a determination on whether the statement qualified as an excited utterance.

Williams then argued that the mother was not credible because she was vague about the timing of events—in particular as to when An.J. reported discomfort to her and when she related the events to the police.[3] Williams added that the timing was crucial given it's importance to making an excited utterance determination. The court then ruled that An.J.'s disclosure was an excited utterance because it "was in a circumstance of spontaneity" and "where there wouldn't be any real likelihood or opportunity of fabrication." The court declined to rule on whether An.J. was or had been competent. Thus the

---

3. Such confusion was hardly surprising given the mother's testimony was some nine years after the sexual assault took place.

court permitted the mother to testify about the 1991 sexual assault to the jury.

 In order to hold that a statement qualifies as an excited, or spontaneous, utterance, the trial court must find that it satisfies three requirements: "(1) the presence of a serious occurrence which causes a state of nervous excitement or physical shock in the declarant, (2) a declaration made within a reasonably short period of time after the occurrence so as to assure that the declarant has not reflected upon his statement or premeditated or constructed it, and (3) the presence of circumstances, which in their totality suggest spontaneity and sincerity of the remark." *Smith v. United States,* 666 A.2d 1216, 1222 (D.C.1995) (quoting *Nicholson v. United States,* 368 A.2d 561, 564 (D.C. 1977)). A determination by the trial court that a statement is admissible as an excited utterance is left to its sound judgment. *Id.*

 There can be no doubt that a sexual assault qualifies as serious occurrence. *See, e.g., Welch v. United States,* 689 A.2d 1 (D.C.1996). The mother's jury testimony established that she picked An.J. up from Williams' apartment some time before 4 p.m. She then began to prepare dinner in the kitchen but was interrupted by An.J.'s sister saying that An.J. needed to urinate but would not. She testified that, after several admonishments, she took An.J. to the bathroom herself. An.J. was crying and would not urinate. She informed her mother that her "bird" hurt because Williams had put his "tee tee" in her "toosy." She testified that she was not sure exactly when An.J. told her what happened, and that she approached Williams to talk with him after learning about it. She also testified that she first

learned of the assault, then reported it to the police and took An.J. to the hospital all on the same day. She said that An.J. did not appear upset when she first picked her up from Williams' apartment. She admitted that she was using drugs at the time in her life. Therefore, although the evidence is imprecise as to the exact time An.J. revealed the assault, we cannot say that the trial court was required to discredit her testimony that the child revealed the information to her sometime around 4 p.m., within a few hours of the event itself.

Finally, the record supports the trial court's finding that the context in which the remarks were made were indicative of sincerity and spontaneity. An.J. was crying at the time, and only revealed what had happened when her mother took her to the bathroom and found she could not urinate.

## VI. Sufficiency of the Evidence

 Williams challenges the sufficiency of the evidence for one of his convictions of first degree child abuse. Count III of the indictment charged Williams with penetrating H.T.'s mouth with his penis "between on or about April 1, 1999, and February 3, 2000."[4] Williams' contention is that the prosecution failed to introduce any evidence as to when the offense occurred.

 This court reviews the evidence in the light most favorable to sustaining the convictions, "giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *White v. United States,* 714 A.2d 115, 118 (D.C.1998) (quoting *Curry v. United*

---

4. The trial court granted a motion for judgment of acquittal as to the first count, which alleged similar conduct occurred between

September 1, 1998, and March 30, 1999, a period approximately contemporaneous to the family's residence in a different apartment.

*States,* 520 A.2d 255, 263 (D.C.1987)). We will not reverse the jury verdict unless Williams establishes "that the government presented 'no evidence' upon which a reasonable mind could find guilt beyond a reasonable doubt." *Mihas v. United States,* 618 A.2d 197, 200 (D.C.1992) (citation omitted).

▇ Rather than make an argument as to the sufficiency of the evidence for the elements of the offense, Williams essentially argues that "the government constructively amended the indictment or impermissibly varied therefrom by failing to prove a fact asserted in the indictment." *Jones v. United States,* 716 A.2d 160, 166 (D.C.1998) (citation omitted). "[W]hen an indictment charges that the offense occurred 'on or about' a certain date, as it did here, a defendant is on notice that a *particular* date is not critical. The evidence will conform to the indictment in such circumstances if it establishes that the offense was committed on a date reasonably close to the one alleged." *Id.* (emphasis in original) (quoting *Ingram v. United States,* 592 A.2d 992, 1007 (D.C. 1991)).

As an initial matter, we note that it is difficult for child witnesses to identify exact times, dates, and locations. *See, e.g., Pace v. United States,* 705 A.2d 673, 677 (D.C.1998); *Jackson v. United States,* 503 A.2d 1225, 1226–27 (D.C.1986). In her testimony while being impeached with the CAC videotape, H.T. agreed that Williams put his "tail" in her mouth, but the prosecutor did not establish a time frame for when this happened. In the CAC statement, however, H.T. relayed that she was three years old when Williams started "doing these things" to her. H.T. turned three on June 22, 1998, and would, therefore, still have been three on April 1, 1999, when the time period associated with the instant offense began.

Thus, because the relevant portion of the CAC statement was properly introduced into evidence, viewing this evidence in the light most favorable to upholding the verdict as we must, *White, supra,* we conclude that the government provided sufficient evidence upon which a reasonable mind could conclude beyond a reasonable doubt that this charged offense occurred during the time period specified in the indictment. *Mihas, supra.*

## VII. Closing Argument

▇ During the prosecution's rebuttal closing argument, the prosecutor stated: "that little girl was under so much stress she curled up in a fetal position out there and that's why we went on camera. And when we went on camera she knew he was still there." Williams objected to this observation but the prosecutor continued: "She told Ms. Staunch the reason she didn't want to answer questions is because she was afraid. She had fear. And imagine a little baby girl whose person is one of the sole people providing care, food, shelter, in the courtroom with you telling you don't tell the secret." Williams objected again, but the trial court overruled the objection, noting that "[i]t's argument."

▇ When analyzing a claim of prosecutorial overreaching of this sort, we must first consider whether the comments were improper. *Coreas v. United States,* 565 A.2d 594, 600 (D.C.1989) (citation omitted). If they were, we then determine whether "substantial prejudice" resulted. *Id.* (citation omitted). In order to make this determination, we consider "whether we can say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Diaz v. United States,* 716 A.2d 173, 181 (D.C.1998) (quoting *Dyson v. United States,* 418 A.2d 127, 132 (D.C.

1980)). Therefore, we consider, the gravity of the remark, its relationship to guilt, whether the court made corrective instructions, and the strength of the government's case. *McGrier v. United States,* 597 A.2d 36, 41 (D.C.1991) (citation omitted).

The prosecutor first argued that H.T. knew Williams was still in the courtroom when she testified via closed circuit television from the jury room. Since the jury rooms are accessible from a rear door of the courtroom, it is most likely that the child was shown into and out of the jury room by way of the courtroom itself. Moreover, it is likely that at least one of the persons in the jury room—which included the prosecutor, defense counsel, Ms. Staunch, the court reporter, and an audio-visual assistant—did move to and from the courtroom, where the child had already spent considerable time on the witness stand. In addition, the child interacted with the trial judge over a microphone link[5] and there is at least some degree of likelihood that she believed he was still on the bench, where she had seen him last. Therefore the record shows that the prosecutor made a reasonable inference that H.T. was aware of Williams's presence nearby in the courtroom.

With respect to the second remark—that Williams had instructed H.T. not to tell her secret—H.T. had testified that Williams told her not to tell her secret after the abuse occurred. Williams contends that there was no proof that he told her this while they were in the courtroom. The phrasing of the sentence supports his interpretation, but we think it more likely that the jury understood the argument to refer to H.T.'s testimony that Williams earlier told her to keep secret his abusive conduct. Even assuming, arguendo, that the comment was improper, it did not substantially prejudice Williams.[6] Accordingly, we affirm.

---

5. The judge's voice could be heard by microphone in the jury room and the prosecutor informed H.T. that she needed to respond "yes" or "no" "because the judge can't see you shake your head."

6. Williams appears to object also to the prosecutor's remark that "[H.T.] showed with you [sic] that tape and you saw [sic] her words when the Defendant wasn't present." Williams did not object to this statement at trial and, even assuming it was improper—which we doubt—we cannot say that the trial court plainly erred when it failed to take any action in response to this comment.