**David E. KOONCE, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 04–CF–1181.**

District of Columbia Court of Appeals.

Argued Sept. 10, 2009.

Decided April 15, 2010.

---

**22.** D.C.Code § 22–303 (2001).

Donna L. Biderman, for appellant.

Kristina L. Ament, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time the brief was filed, Roy W. McLeese III, Assistant United States Attorney, and Florence Pan, Assistant United States Attorney at the time the brief was filed, were on the brief for appellee.

Before WASHINGTON, Chief Judge, KRAMER, Associate Judge, and NEWMAN, Senior Judge.

WASHINGTON, Chief Judge:

David E. Koonce appeals from his conviction on a single count of first-degree child sexual abuse of his girlfriend's niece ("S.W."), whom a jury found he had anally sodomized when she was eight years old. He was indicted on four separate counts of the same charge, under D.C.Code § 22–3008 (2001),[1] but the jury deadlocked on

1. Koonce was charged under D.C.Code §§ 22–4108, –4120 (1981), which were reco-

two and acquitted on the fourth, apparently due in part to S.W.'s inconsistent and porous testimony and the lack of concrete physical evidence. On appeal, Koonce contends that: (1) there was insufficient evidence that a "sexual act" occurred as required for conviction under the statute; (2) a videotape ("CAC Tape") of an out-of-court interview conducted with S.W. at the Child Advocacy Center ("CAC") was improperly admitted to impeach S.W.'s testimony and as substantive evidence because it was neither sworn testimony nor adopted by her; and (3) evidence of a similar but uncharged prior act of sexual abuse ("Maryland incident") was wrongfully and prejudicially admitted. We hold that sufficient evidence was presented to sustain Koonce's conviction and that the CAC Tape was adopted as sworn testimony, and thus properly admitted at trial. However, because we also hold that the Maryland incident was wrongly admitted, prejudicing Koonce, we reverse and remand for a new trial.

### I.

Evidence presented at trial established that during the summer of 1999 Koonce lived in a small one-bedroom apartment on Hobart Place in Washington, D.C., with his girlfriend Anita Pratt and her three children. Koonce was approximately twenty-seven years old at the time. In June of that year, financial troubles forced Alisa Pratt, Anita's sister and S.W.'s mother, to move from Maryland into the Hobart Place apartment with her infant son and then eight-year-old S.W., for approximately three months. The small apartment was crowded; in addition to Koonce, Anita and their three children, and Alisa and her two children, S.W.'s grandmother also moved into the apartment in July 1999, and friends of Koonce and various babysitters, including Koonce's mother, were often present. During that period, Anita and Alisa worked full time, but Koonce did not work during the day and was frequently at home when S.W. returned from summer camp in the afternoon. It is during these afternoons that Koonce repeatedly sexually abused S.W., according to the prosecution.

The first time S.W. told anyone about the sexual abuse was in February 2001, when her Maryland elementary school played a videotape on bullying, prompting her to seek out the school's guidance counselor to talk about the sexual abuse from "last summer." The counselor testified that she asked S.W., who suffered from a speech impediment, whether "somebody [was] touching her in a way that was making her feel uncomfortable." S.W. did not answer immediately and then began to stutter what seemed to the counselor to be an affirmative response. After repeated "yes or no" questioning and use of a doll as a prop, which were necessary because S.W. was stuttering uncontrollably, she denied having been touched on the chest or vagina at all, or by a hand on her buttocks, but she answered "yes" to the question of whether a penis had been in her "behind." S.W.'s stuttering was extreme and uncharacteristic for her, according to the counselor, who referred the case to local Maryland police. The police determined on the basis of an interview with S.W. that the abuse took place exclusively in the District of Columbia, and referred the case to District authorities.

On February 22, 2001, S.W. underwent an initial medical examination to determine whether there were physical indications of sexual abuse. The examiner reported inconclusive findings of anal tags, possible genital warts, and some slight appearance

dified and superceded by § 22–3008.

of what might have been scarring. No definitive diagnosis was made as to the genital warts, and the examiner testified that she saw nothing else that indicated sexual abuse. During the examination, S.W., who would not verbally state what had happened to her, wrote on a piece of paper, "He put his peneis [sic] in my behind." According to the medical examiner's testimony, S.W. said the abuse was perpetrated by a family member named David. A second medical examination of S.W. took place in March 2001, and the second examiner reported that she saw no evidence of anal scarring, that S.W.'s anal tags were consistent with normally occurring anal features, and that she tested negative, though inconclusively, for genital warts. S.W. also tested negative for gonorrhea and syphilis, both of which Koonce was infected with, according to his testimony at trial. According to the second examiner, S.W. told her that "when [she] was eight [her] uncle touched her," though the examiner's contemporaneous notes do not mention the word "uncle." When asked where she was touched, she replied, "My butt," but then became too emotional to explain what she was touched with. The second medical examiner's report, relying upon and building off of the first examiner's report, expressed the opinion that S.W. had been sexually abused.

On March 23, 2001, the CAC recorded an unsworn interview with S.W. in which she revealed details of the incidents of sexual abuse to a detective. It was in the course of this hour and a half-long interview, during which she frequently paused but stuttered less than in most other interviews, that S.W. first mentioned an abusive event prior to the 1999 summer incidents. On the CAC Tape she communicated the following, though frequently by nodding or answering "yes" or "no" to the interviewing detective's questions: In Maryland, on unspecified date—S.W. stated that she was eight years old at the time, but the prosecution contended at trial that it was in 1996 or 1997, when she was approximately five or six years old—she was watching pay-per-view wrestling on television at night with Koonce, Anita, Alisa, and the other children. It is unclear whose residence this incident took place in, though it appears to have been her grandmother's apartment at the time. S.W. stated that her mother went to sleep in the bedroom with her infant brother, and her aunt Anita and her two cousins fell asleep in the living room, where she and Koonce were watching television. She remembered that she was wearing a Disney Little Mermaid nightgown. Koonce got up, went to the bathroom, and returned as S.W. was leaning over the back of the couch to retrieve a doll. Koonce asked her if she "want[ed] to be a big girl," to which she said, "Yes." She then "felt him pull down [her] panties," and "put . . . his penis in [her]" anus. The abuse took place behind the couch in the living room on which her relatives had fallen asleep. She spoke inconsistently about whether she saw his penis on this occasion, but stated clearly that she did not remember what it looked like. He did not tell her not to tell anyone, but she never told anyway. S.W. also expressed clearly that this was the first incident of sexual abuse by Koonce, and that all subsequent incidents of anal sodomy took place in the Hobart Place apartment in the District.

The CAC Tape also contained S.W.'s substantially less detailed statements that Koonce had done the "same thing" at the Hobart Place apartment in 1999, while she was playing Connect Four on the bed and grandma was over, and also once while she was watching cartoons after Koonce showered and called her into his bedroom. The only time Koonce told her not to tell, she said, was after the shower-cartoons inci-

dent. More generally, and not in reference to any specific incident, S.W. indicated that when she said "private" she meant "penis." She also stated that she never felt his legs or anything else touch her, though she heard him breathing heavily "like he was running," and her "behind" or "bottom" hurt afterward "sometimes." She never saw or felt blood or any other substance in her panties. She did feel a need to "go to the bathroom" after incidents, but nothing would happen when she sat on the toilet. An incident when she was wearing a red skort outfit was not mentioned, and she stated that no specific incident occurred while she was laying on the floor.

The entire CAC Tape was played to the grand jury during S.W.'s testimony in that proceeding. She commented on the tape while it was being played, adding information and correcting at least one fact recorded in the prior unsworn interview. Among the details added were Koonce's use of baby oil during a "red skort" incident and a feeling of wetness after an "on the floor" incident. Also, she added that when she sat on the toilet afterward something felt like it was dripping down. Additionally, she testified that she was rarely alone with Koonce, and that the Connect Four incident had been on the floor, not on the bed. It is unclear in the record whether she formally adopted the CAC Tape as her statement during the grand jury proceedings, though she did initial it, but she testified at trial that she knew the CAC Tape was her's because she signed it.[2] Finally, in reference to the "Connect Four" incident, S.W. was asked by the grand jury whether Koonce put his "private" "inside or outside of [her] bottom," and she responded that it was "[i]nside."

Koonce was indicted by the grand jury for, *inter alia*, four identical counts of first-degree child sexual abuse in violation of D.C.Code § 22–3008, arising from four specific incidents referred to during trial by identifying details: Count One "while watching cartoons"; Count Two "while wearing a red skort"; Count Three "while playing Connect Four"; and Count Four "while lying on the floor."

At trial, Alisa Pratt, S.W.'s mother, testified that her daughter started stuttering around the time the alleged 1999 abuse took place. She added that S.W. manifested a changed personality, including a fear of taking her clothes off, but she never seemed scared of Koonce nor indicated a dislike of him. Alisa Pratt was impeached with her grand jury testimony that S.W.'s stuttering started in 2000. Additionally, she testified that her daughter had once complained that her bottom hurt, in July 1999, but Alisa Pratt assumed it was constipation and did not inquire further, nor did S.W. elaborate or repeat the complaint.

S.W. was ten years old at the time of trial. Though she did not explicitly state that Koonce sexually abused her or sodomized her anally during her trial testimony, she did use euphemisms, including calling the abuse the "bad touch," a term the meaning of which was established through other evidence as being the act of anal sodomy perpetrated with Koonce's penis. The only incident about which S.W. testified with any real specificity and few contradictions was the initial Maryland incident, which, according to the prosecution, took place sometime in 1996 or 1997. Relying on *Pounds v. United States*, 529 A.2d 791 (D.C.1987), the trial court admitted evidence of the uncharged Maryland incident after a motion *in limine* hearing.

**2.** It is not clear in the record whether S.W. signed or initialed the CAC Tape itself, a tran-script, or an affidavit attesting to its authenticity.

While testifying about the Maryland incident, S.W. stated that "it hurt" when Koonce touched her "bottom," but would not state what he touched her with. In contrast with her statements on the CAC Tape, she did not testify that he asked her whether she wanted to be "a big girl," or that the "bad touch" took place behind the couch in the living room. Instead, she testified at trial that he removed her panties and then left to go to the bathroom, at which point she went to her bedroom (possibly at his direction). He then came into the bedroom and directed her to lie on her side on the floor. He stood above her with his underwear but no pants on, but she never looked up to see if he had undressed fully nor saw what he touched her with. She did not see his penis. After he "touched" her, he told her not to tell anyone and she went into the room where her mother was sleeping and went to sleep. She saw nothing in her panties after the incident, and she told no one because Koonce told her not to and her mother always told her to listen to adults.

S.W. also testified that she did not tell the first medical examiner she had been abused. The government introduced the writing she made for the first examiner, which read, "He put his peneis [sic] in my behind," and S.W. started crying when asked to read it out loud to the court. She stated that she did not remember talking to the second medical examiner about "why she was there" being examined. Regarding the CAC Tape, S.W. testified that she told the interviewing detective about "the bad touch," but would not clarify what that phrase meant. However, she testified in writing that "[t]he bad touch is when David puts his privates in my behind." The transcript of the trial makes clear that this written statement was not made in reference to a specific incident of abuse, but rather in response to a generalized series of questions about whether she had

been sexually abused by Koonce at any time.

After S.W. testified that she did not remember a "bad touch" which occurred while playing Connect Four and that no incident occurred on the floor at all or while playing games, that the "red skort incident" was also while she was watching cartoons and did not involve baby oil, and that the Maryland incident occurred in the bedroom, the prosecution moved to impeach her with the CAC Tape and her grand jury testimony. The trial court granted the motion and permitted the prosecution to impeach with respect to the Hobart Place incidents—which concerned the four charged counts—but restricted use of the CAC Tape and the grand jury testimony as to the Maryland incident "to those parts of that incident that were not testified here today, but not more than that," because anything more "would be in the nature of [impermissible] prior consistent statements." Following that ruling, certain portions of the CAC Tape were played to the jury, though which segments were played is not included in the transcript nor as part of the record on appeal. The following limiting instruction was given to the jury as part of the trial court's final instructions regarding the proper use of prior bad acts and prior crimes evidence:

> It is up to you to decide whether to accept this evidence. If you find that the Defendant did in fact place his penis in the Complainant's anus in Maryland prior to the alleged acts charged in the indictment, consider the evidence only for the limited purpose of determining the history between the Complainant and the Defendant and whether or not the Defendant had a predisposition to gratify his desires with the Complainant in this case.

The jury found Koonce guilty of Count One "while watching cartoons," acquitted on Count Four "while lying on floor," and deadlocked on Counts Two "while wearing a red skort" and Three "while playing Connect Four." He was sentenced to eleven to thirty-three years' imprisonment. This timely appeal followed.

## II.

▉ Koonce contends that the government presented insufficient evidence to sustain his conviction. The inquiry of whether sufficient evidence was presented to prove beyond a reasonable doubt that the defendant committed the crime of which he is charged is an exercise of considerable deference in which this court views the evidence in the light most favorable to the government, "giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact." *Spencer v. United States*, 688 A.2d 412, 415 (D.C.1997). Reversal of a conviction on insufficient evidence grounds can only be ordered when "the government ... produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Gayden v. United States*, 584 A.2d 578, 579 (D.C.1990). "At a minimum, this means that the government must present 'at least some probative evidence on each of the essential elements of the crime.'" *Price v. United States*, 746 A.2d 896, 899 (D.C. 2000) (citation omitted). Furthermore, in evaluating the sufficiency of the evidence, "we consider *all* the evidence admitted at trial." *Moore v. United States*, 927 A.2d 1040, 1049 (D.C.2007) (emphasis added). However, whether the evidence is persuasive is a determination left to the jury, and "[i]t is axiomatic, that as assessors of a

witness' credibility, the jury is always free to accept parts of a witness' testimony and reject other parts. Similarly, contradictions among witnesses at trial are inevitable and are matters for the jury to resolve as they weigh all the evidence." *Payne v. United States*, 516 A.2d 484, 495 (D.C.1986).

▉ Notwithstanding our deference to the jury as the finder of fact, the Fifth Amendment right to due process and the Sixth Amendment right to trial by jury together mandate that "criminal convictions ... rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Moore, supra*, 927 A.2d at 1060 (citing *United States v. Gaudin*, 515 U.S. 506, 510, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995)). The proof of each element of the crime must also be specific to the conduct charged in the indictment, rather than amalgamated from other conduct generally, even though "[t]he particularity of time, place, circumstances, causes, etc .... is not essential to an indictment." *Glasser v. United States*, 315 U.S. 60, 66, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

Here, under D.C.Code § 22–3008, the conviction of first-degree child sexual abuse required proof beyond a reasonable doubt of three elements: (1) Koonce was more than four years older than S.W.; (2) S.W. was a child;[3] and (3) Koonce engaged in a "sexual act" with her. A "sexual act" is "penetration, however slight, of the anus or vulva of another by a penis...." *Id.* § 3001(8). On appeal, only the third element is at issue, whether the prosecution presented sufficient evidence that penetration of S.W.'s anus by

---

**3.** A "child" is a person under sixteen years old at the time of the abuse. D.C.Code § 22– 3001(3).

Koonce's penis occurred that a reasonable juror could find guilt beyond a reasonable doubt.

As a threshold matter, the indictment charged Koonce with four identically worded but distinct counts of anal sodomy, and the jury convicted on the "while watching cartoons" incident. Therefore, and unlike for an indictment that alleges a continuing course of indistinct abuse spanning a given time period, the evidence must have been sufficient to support conviction as to the incident represented by that count. Accordingly, the trial court instructed the jury that "[a] separate offense is charged in each of the counts in the indictment. . . . Each offense and the evidence which applies to it should be considered separately and you should return separate verdicts as to each." In this case, consequently, the evidence had to be sufficient to prove that a sexual act occurred while S.W. watched cartoons sometime between on or about June 1, 1999 and on or about August 30, 1999, at the Hobart Place apartment.

Reviewing the evidence concerning the "while watching cartoons" incident, we are satisfied that sufficient evidence was presented to permit a reasonable juror to find that Koonce put his penis in S.W.'s anus while she watched cartoons sometime between mid-June and August 1999. The CAC Tape presents relatively clear statements by S.W. that on a particular day, Koonce called her into his bedroom, and she "[t]urned on the TV and . . . turned on the—the cartoons. And then . . . he come [sic] out of the closet . . . [wearing a] white T-shirt and boxers . . . and he put his private in [her] bottom again." S.W. did contradict herself several times over the course of her taped CAC interview, grand jury testimony, and trial testimony, but taking the facts in the light most favorable to the prosecution, as we must, we are satisfied that a reasonable juror could find beyond a reasonable doubt that Koonce committed a sexual act against S.W. while she watched cartoons during the relevant time period on the basis of the evidence presented at trial.

### III.

Koonce next contends that the CAC Tape, introduced to impeach S.W.'s testimony and as substantive evidence of the sexual abuse, was neither sworn testimony nor adopted as such by her. Instead, he argues, the unsworn CAC Tape was merely played before S.W. during her grand jury testimony, which does not constitute adoption of it, and she corrected certain portions of it rather than affirming its contents. As Koonce did not object to the admission of the CAC Tape on this ground, our review of this issue is limited to "plain error." Under plain error review, we will upset the trial court's determinations only if the error was plain or obvious. See Watts v. United States, 362 A.2d 706, 709 (D.C.1976) (en banc) ("[T]o discourage the intentional withholding of objections by defense counsel, errors not objected to at trial are unreachable on review unless they fall within the purview of the plain error rule.").

When a witness is impeached with a prior inconsistent statement the prior inconsistent statement is only admissible as substantive evidence if the witness adopts it while testifying under oath at a prior proceeding. See D.C.Code § 14–102(b) (1996) ("A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is . . . inconsistent with the declarant's testimony and given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition . . . ."); and see, e.g., Mercer v. United States, 724 A.2d 1176, 1195 (D.C.1999) ("When a wit-

ness testifies under oath and adopts a prior statement not made under oath, that prior statement becomes substantive evidence.").

■ Adoption of an unsworn prior inconsistent statement need not be formal; a witness being impeached with a prior inconsistent statement can adopt it simply by confirming that the factual contents of the prior statement are true. *See, e.g., Byers v. United States,* 649 A.2d 279, 284 (D.C.1994). For example, in *Mercer v. United States, supra,* a witness "adopted the contents of the [unsworn videotaped] statement, but not the videotape itself, before the grand jury while under oath. As such, it became evidence in the grand jury proceeding, and thus potentially admissible at trial under D.C.Code § 14–102(b)(1) where inconsistent with her trial testimony." 724 A.2d at 1196. Similarly, in *Williams v. United States,* 859 A.2d 130, 133 (D.C.2004), a child sexual abuse victim's unsworn, out-of-court CAC interview was admitted as substantive evidence after the child was impeached with the videotaped interview and then testified consistently with its contents, "essentially adopt[ing]" the statements. *Id.* at 135. On appeal, we held that "[b]ecause [she] testified, after being impeached with the . . . [ ] tape, that Williams had in fact done what the record reveals, she adopted those portions of the [tape] used to impeach her." *Id.* at 138. In short, an unsworn videotape played to a witness during her grand jury testimony becomes part of her sworn testimony in that proceeding when she adopts the contents by confirming their truth. Thus, the contents of the statement are admissible as substantive evidence when subsequently used to impeach her inconsistent testimony at trial. *See, e.g., Mercer, supra,* 724 A.2d at 1196.

Here, S.W. signed and/or initialed the CAC Tape while under oath before the grand jury. A fair reading of the grand jury transcript indicates that she then generally affirmed the contents of the CAC Tape and confirmed numerous specific facts stated therein. For example, during one line of questioning directly following the playing of a portion of the CAC Tape, the prosecutor asked, "Was this at, at Hobart Street, or where was this when Grandma was there"? S.W. responded, "Hobart," and the prosecutor continued, saying, "This was at Hobart, so this was a third time. This is besides the time that you were telling me about when you were on the bed watching TV and the time you were on the floor with the red skirt." S.W. responded, "Yes." Conversely, it appears from the grand jury transcript that S.W. only once directly contradicted something she had said on the CAC Tape; she indicated that she wanted to interrupt the playing of the tape and stated, "Actually, when I went to go ask my Aunt Nita, it was just me, my mother, my brother and her and Octavia." Given the silence in the record as to which portions of the CAC Tape were played at any specific moment, we cannot know to what S.W. actually responded, but it is clear that she generally testified before the grand jury in concert with rather than in contrast with her statements recorded on the CAC Tape.

Therefore, we are satisfied that S.W. adopted the contents of the CAC Tape as sworn testimony during her grand jury testimony, and once adopted, the contents became admissible as substantive evidence where used to impeach her testimony at trial. *See id.;* and D.C.Code § 14–102. Thus, we hold that the trial court did not commit clear error when it admitted into evidence those portions of the CAC Tape which S.W. had contradicted during her testimony at trial.

## IV.

■ Finally, Koonce contends that the trial court erred in admitting evidence

of the Maryland incident, an uncharged prior bad act, which unfairly prejudiced him and constituted reversible error. The trial court admitted the evidence of the Maryland incident after concluding that it fell within the narrow exception to the inadmissibility of propensity evidence carved out in *Pounds v. United States, supra,* and was "clearly probative ... [and] outweigh[ed] any possible prejudice." Koonce objected on this ground at the trial level, so we review its admission for abuse of discretion. *See Johnson v. United States,* 683 A.2d 1087, 1090 (D.C.1996). However, we are mindful that "the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *Id.* at 1095.

Under District of Columbia law, prior bad acts evidence is inadmissible to prove a defendant's disposition toward or propensity to commit the charged crime. *See, e.g., id.* at 1090–92 ("[W]e reaffirm the long-standing principle set forth in *Drew v. United States* [, 331 F.2d 85 (D.C.Cir.1964),] that evidence of another crime is inadmissible to prove a defendant's disposition to commit the crime charged."). Prior bad act evidence is presumptively inadmissible because "the likelihood that juries will make ... an improper inference is high...." *Coleman v. United States,* 779 A.2d 297 (D.C.2001). However, such evidence may be introduced for another legitimate purpose, such as proving motive or the identity of the perpetrator, so long as it is not unfairly prejudicial. *See Johnson, supra,* 683 A.2d

at 1092. Evidence is unfairly prejudicial when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Id.* at 1098–99.

In *Pounds v. United States, supra,* this court articulated another narrow exception to the inadmissibility of propensity evidence, holding "that in prosecutions for sexual offenses, evidence of a history of sexual abuse of the complainant by the defendant may be admissible on the theory of predisposition to gratify special desires with that particular victim." 529 A.2d at 794. In so deciding, we considered that "several factors combine[d] to render the probative value of the evidence [of prior, ongoing child sexual abuse of the complainant by the appellant] so high as to outweigh its potential for prejudice." *Id.* at 795. These factors were: (1) "the evidence of sexual contact occurred between the same parties"; (2) "the contact was incestuous";[4] (3) "the contact involved continuing conduct, beginning when complainant was a very young child"; and (4) "knowledge of the contact was pivotal, in some degree, to a determination of innocence or guilt." *Id.* The fourth factor was especially critical in our formulation of the *Pounds* exception because "without information concerning the history of sexual abuse by appellant, certain facts would remain inexplicable," such as her delay in and "lack of hysteria or trauma when finally reporting ... what had been occurring," as well as the lack of physical evidence, which the defendant argued proved the charges were "impossible" given the size of his penis relative to the genitalia of a six-

---

**4.** In the District of Columbia, the crime of "incest" is defined as a relationship "to another person within and not including the fourth degree of consanguinity, computed according to the rules of the Roman or civil law, [where one] shall marry or cohabit with or have sexual intercourse with such other so-

related person, knowing him or her to be within said degree of relationship...." D.C.Code § 22–1901; *see also* MODEL PENAL CODE § 230.2 (1980) ("The relationships referred to herein include blood relations without regard to legitimacy, and relationship of parent and child by adoption.").

year-old girl. *Id.* at 794–95. Specifically, the prosecution in *Pounds* needed to introduce the prior abuse evidence to explain that the victim had waited a long time to report the incidents because her mother had disbelieved her about the abuse early on. *Id.* at 795 n. 5. In essence, we held that the history of continuing conduct was admissible only to place the charged incidents of abuse in an understandable context.[5] *Id.* at 795. However, we also "caution[ed] against embracing an expansion of the [*Pounds*] exception" because "a jury will tend to accord far too much weight to an accused's past misdeeds in its assessment of whether the defendant committed the particular act for which he is on trial." *Id.* at 794 n. 3; *see also Drew, supra,* 331 F.2d at 86; *and see, e.g., Coleman, supra,* 779 A.2d at 297 (noting that "the likelihood that juries will make . . . an improper inference is high . . .").

Critical, we think, to delineating the proper scope of the *Pounds* exception is an understanding of what constitutes "continuing conduct." In *Pounds,* the incidents of sexual abuse occurred over the span of approximately seven years, but neither the frequency of the incidents nor their temporal proximity are known. In *Graham v. United States, infra,* we inter-

preted *Pounds* to permit the introduction of evidence of prior child sexual abuse when (1) the defendant was the victim's mother's boyfriend, who had resided with her since the victim was an infant and whom she considered to be her stepfather; (2) non-intercourse sexual abuse started when the victim was six years old and occurred for six or seven years prior to the start of sexual intercourse at age twelve; and (3) the incidents of intercourse occurred weekly over a period of two years. 746 A.2d at 290–91. While neither the *Pounds* nor *Graham* opinions define "continuing conduct," BLACK'S LAW DICTIONARY defines "continuing" as an act that is "[e]nduring; not terminated by a single act or fact." BLACK'S LAW DICTIONARY 321 (6th ed., 1990) [hereinafter BLACK'S]. Thus, at a minimum, it is necessary that there be evidence of repeated sexual abuse without the interruption of any meaningful periods of time. This definition is also consistent with the dictionary definition of "continuous": "[u]ninterrupted; unbroken; not intermittent or occasional; so persistently repeated at short intervals as to constitute virtually an unbroken series. Connected, extended, or prolonged without cessation or interruption of sequence." BLACK'S at 322.[6]

---

**5.** This situation—where evidence of a history of sexual abuse of a certain child by a family member is not admissible but for the narrow *Pounds* exception—is in part created by the lack of a District statute criminalizing a succession of abusive incidents as a continuing course of conduct or continuing offense. *See* D.C.Code § 22–3008. Several states have enacted "continuing sexual abuse" or "continuous offense" statutes to liberalize the admission of this type of evidence. *See, e.g.,* N.Y. CLS PENAL § 130.75 (Penal 2001); CAL.PENAL CODE § 288.5 (Penal 2006). Other states have adopted, in pertinent part, Federal Rule of Evidence 414, which renders admissible "evidence of the defendant's commission of another offense or offenses of child molestation. . . ." Fed.R.Evid. 414; *and see, e.g.,* Fla.

Stat. Ann. 90.404(2)(b)(1) (Supp. 2004); Ind. Code Ann. 35–37–4–15(a) (Michie Supp. 1998); Tex.Crim. Proc.Code Ann. 38.37 (Vernon Supp. 2004). As a panel of this court, however, we are bound by the precedent set forth in *Pounds* and *Graham v. United States,* 746 A.2d 289, 290–91 (D.C.2000).

**6.** Other courts generally conform to this definition. *See, e.g., State v. Arceo,* 84 Hawai'i 1, 928 P.2d 843, 860 (1996) (defining a "continuous offense" in the context of child sexual abuse as "a continuous, unlawful act or series of acts set on foot by a single impulse and operated by an unintermittent force, however long a time it may occupy[, or] an offense which continues day by day[, or] a breach of the criminal law, not terminated by a single

■ Thus, under *Pounds*, as modified by *Graham*, we hold that prior abuse evidence may be admitted under this narrow exception if (1) the sexual abuse involves a defendant and the same victim; (2) the relationship between the alleged abuser and the victim constitutes or approximates a close familial connection; (3) the pattern of sexual abuse started when the victim was very young and occurred at reasonably short and regular intervals without meaningful interruption; and (4) the evidence is pivotal to the prosecution's case because proof of context is required. *Accord Pounds, supra,* 529 A.2d at 794. Additionally, there must be clear and convincing evidence that the prior abuse occurred. *Groves v. United States,* 564 A.2d 372, 374 (D.C.1989).

Here, the trial court did not explain its reasoning for admitting evidence of the Maryland incident except to state that the lack of technical incest was not adequate to prevent admission of the evidence under *Pounds.* Therefore, we have no way of assessing whether the trial court considered any of the other *Pounds* factors in reaching its decision. *See Pounds, supra,* 529 A.2d at 795. The court in *Pounds,* however, made it clear that this type of propensity evidence must satisfy all four of the *Pounds* factors before being admitted in order to ensure that the prejudicial impact of its admission will not significantly outweigh the probative value of the evidence. *Id.* Here, we agree with the

trial court that the Maryland incident was at least somewhat relevant and probative to show Koonce's inclination to gratify his sexual desires with S.W. Nonetheless, we agree with Koonce that while the sexual abuse was between the same two parties, there is no evidence that their relationship qualifies as "incestuous." Koonce only lived with S.W. for three months in 1999, and there is no evidence that they shared a close familial relationship. S.W. usually referred to Koonce as her "aunt's boyfriend" or "David," though she appears to have called him "uncle" on at least one occasion prior to trial. Consequently, Koonce's relationship with S.W. is different from the fourteen-year father-daughter relationship present in *Pounds* and the approximately fourteen-year essentially stepfather-daughter relationship that we found sufficient in *Graham.* Thus, the relationship in this case is neither incestuous within the plain meaning of the word nor sufficiently familial to fall within the slightly expanded meaning of the term that we endorsed in *Graham.*

Additionally, we are not persuaded that the Maryland incident was part of a continuing course of conduct. According to the prosecution, the Maryland incident occurred sometime in 1996 or 1997, when S.W. was five or six. The four charged counts of child sexual abuse, however, took place during an approximately ninety-day period in 1999, when S.W. was eight years old. As such, a considerable break oc-

act or fact, but subsisting for a definite period and intended to cover or apply to successive similar obligations or occurrences") (citations omitted) (alterations in original); *People v. Cooks,* 446 Mich. 503, 521 N.W.2d 275, 284–85 (1994) (finding a continuous course of conduct when "the evidence offered in this case to support each of the alleged acts of penetration was materially identical, i.e., the complainant's equivocal testimony of an anal penetration, occurring in the same house over an unspecified three-day period in January

1989, while only she and defendant were in the room"); *State v. Floody,* 481 N.W.2d 242, 253–54 (S.D.1992) (upholding "[t]he trial court['s] conclu[sion that] evidence of ['other noncontemporaneous'] sexual contact committed by Floody on [six-year-old] A.C. during the same time period; in the same place; and under similar factual situations, although extrinsic to the crime charged . . . , would show a continuous 'plan or system' of criminal action . . . ").

curred, lasting somewhere between eighteen months and just under three years, without any evidence that any abuse took place in the interim. A single incident followed by a break in conduct of as much as two or more years is not "so persistently repeated at short intervals as to constitute virtually an unbroken series" of events. BLACK'S, *supra,* at 322.

Finally, we are not satisfied that the evidence of the Maryland incident was "pivotal" to the prosecution's case. During the motion *in limine* hearing on the admissibility of the Maryland incident, the prosecution emphasized that admission of the evidence was necessary because "we need a starting point" for eliciting testimony from S.W. because she is such a difficult witness, and "that's the only [incident] that she has so many details, and the types of details that she gives about that incident gives it strength and gives it bulk...." The prosecution also added that "[t]he real significance of that first incident in Maryland is because it was the first one, it was the most memorable.... I just need[ ] the Maryland count really to set the stage." The fact that S.W. could only testify with the prosecution's desired level of detail about the uncharged Maryland incident does not make the evidence "pivotal" to the prosecution's case as that term was used in *Pounds.* Unlike in *Pounds,* the prior abuse evidence was not needed to explain why S.W. did not come forward sooner. S.W.'s failure to tell anyone about the abuse was explained by her testimony that Koonce told her not to tell anyone and evidence that her mother told her to always listen to adults. Second, unlike the victim in *Pounds,* who was calm and untraumatized when reporting the abuse, S.W. was hysterical, stuttering, crying, and refusing to answer questions.

In sum, this case does not fit within the narrow exception to the prohibition on admitting prior bad act evidence that was articulated in *Pounds* and *Graham.* Instead, we heed *Pounds'* "caution against embracing an expansion of the exception" because "a jury will tend to accord far too much weight to an accused's past misdeeds in its assessment of whether the defendant committed the particular act for which he is on trial." 529 A.2d at 794 n. 3.

■ Having determined that the evidence of the Maryland incident should not have been admitted, we now consider whether this error sufficiently prejudiced Koonce to warrant reversal of his conviction. Under the harmless error standard articulated in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), we must be able to say "with fair assurance ... that the judgment was not substantially swayed by the error" and not just that "there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself has substantial influence." *Id.* at 765, 66 S.Ct. 1239. Here, though the evidence was sufficient to convict Koonce of the "cartoons" incident, the government's case was not particularly strong, as evidenced by the fact that Koonce was acquitted of one count and the jury deadlocked on two. There was neither eyewitness nor physical evidence of Koonce's abuse of S.W., and S.W., who presented the only testimony directly incriminating Koonce, often testified either incomprehensibly or with sufficient contradictions to warrant her broad impeachment by the government. By comparison, her testimony about the Maryland incident was relatively lucid and detailed. Given the fact that her testimony about the charged 1999 incidents was difficult to follow and the evidence of the Maryland incident—the anal sodomization of a five or six-year-old in a Little Mermaid nightgown—was detailed, graphic and potentially inflammato-

ry, we cannot say with fair assurance that Koonce's conviction was not swayed by the wrongfully admitted prior bad act evidence.

Accordingly, we reverse Koonce's conviction for first-degree child sexual abuse and remand the case for a new trial.

*So ordered.*