Alvalonze GRAHAM, Sr., Appellant,

v.

UNITED STATES, Appellee.

No. 97–CF–468.

District of Columbia Court of Appeals.

Argued Feb. 16, 1999.

Decided Feb. 10, 2000.

William T. Morrison, Ellicott City, MD, appointed by the court, for appellant.

Thomas P. Swanton, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, John R. Fisher, Thomas C. Black, and Peter V. Taylor, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and GALLAGHER, Senior Judge.

GALLAGHER, Senior Judge:

After a jury trial, appellant Alvalonze Graham was convicted of three counts of first degree sexual abuse, D.C.Code § 22–4102 (1995 Repl.), three counts of first degree child sexual abuse, D.C.Code § 22–4108 (1995 Repl.), four counts of rape and unlawful carnal knowledge, D.C.Code § 22–2801 (1994 Supp.),[1] one count of obstruction of justice, D.C.Code § 22–722(a)(2)(A) (1995 Repl.), and four counts of taking indecent liberties with a child, D.C.Code § 22–3501(a) (1994 Supp.).[2] Graham appeals contending: (1) the trial court erred when it admitted statements Graham made to a social worker; (2) the trial court erred in admitting evidence of "other crimes" not charged; and (3) the evidence was insufficient to sustain a conviction of rape and unlawful carnal knowledge. We affirm.

## I. Facts

The complaining witness, T.G., provided graphic detail of how Graham began sexually abusing her when she was six years old. During this time, Graham threatened to kill T.G. if she told anyone of the abuse. T.G. considered Graham to be her stepfather, as Graham had lived with T.G.'s mother since T.G. was one year old.

Graham first engaged in actual intercourse with T.G. in October 1994, when she was twelve years old. Prior to that time, the sexual abuse fell short of intercourse. Graham forced T.G. to comply by hitting her with his hand, and told T.G. not to tell anyone of this incident. Between October 1994 and March 1996 (the date when Graham had left the household), Gra-

---

1. This section was repealed on May 23, 1995, by D.C. Law 10–257, § 501(a), 42 DCR 53. The conduct for which Graham was charged, however, occurred between October and December 1994, when the law was still in effect.

2. This section was repealed on May 23, 1995, by D.C. Law 10–257, § 501(b), 42 DCR 53.

ham engaged in intercourse with T.G. on a weekly or monthly basis.

The relationship between T.G.'s mother and Graham deteriorated, and Graham left the household on March 3, 1996. Graham reconciled with T.G.'s mother, and moved back into the household sometime in the middle of March. On March 25, 1996, T.G. told her mother that Graham had sexually molested her. The next day, while T.G. was in school, her mother informed other family members of the alleged abuse. T.G. went to her uncle's house that night, and her aunt informed the police of the abuse. Meanwhile, Graham got into an argument with the nephew of T.G.'s mother, and left the household.

On March 27, 1996, Graham was scheduled to appear in the Family Division of the Superior Court in connection with a request for a restraining order that had previously been filed by T.G.'s mother. At that time, Graham learned from his lawyer of T.G.'s accusations of sexual abuse. That night, Graham decided to go to a homeless shelter in Northeast Washington. Graham testified that he could not stay with his grandmother because she had no room for him. Graham further testified that he made no attempt to see if he could stay with either his mother or his aunt, both of whom lived in the District.

On March 28, 1996, Graham made an appointment to speak with Raymond Patterson, a social worker with Health Care for the Homeless. Patterson was associated with a homeless shelter on Fourteenth Street in Northwest Washington. Graham and Patterson spoke the next day. Graham testified that this interview was required before he could enter the homeless shelter in Northwest Washington. Graham had had his vocal cords surgically removed about one year prior to the interview because of throat cancer, and responded to Patterson's questions by writing answers on a pad of paper.

When asked why he came to the clinic, Graham responded by writing, "I used drugs, beer and my kids to kill the pln [sic]." Patterson asked if Graham meant "pain" when he wrote "pln." Graham responded affirmatively. Patterson asked to clarify what he meant by that. Graham hesitated, then wrote, "I sex abuse one and ... the other ...." [3]

Patterson asked when was the last time Graham sexually abused anyone. Graham wrote, "three months ago." Graham then wrote, "Me and [T.G.] sex active to each other for seven or eight year." After another question, Graham wrote, "Me and [T.G.] sat down one night when [T.G.'s mother was not home] and talk it over. Me and [T.G.] feel good about it. She was open and I was, too. Me and her can sit down and talk about sex without no problem. She can['t] talk to her, just me. I try to take care of it myself."

Patterson spoke with his supervisor about this conversation. On March 29, 1996, Patterson informed Graham that he would have to report the incident to the police. Graham nodded and shrugged his shoulders.

A grand jury indicted Graham on June 4, 1996. Before the trial, Graham filed a motion to prohibit the government from introducing any evidence of sexual abuse of T.G. that was not charged in the indictment. The government proffered that T.G. would testify that sexual abuse had been occurring since she was six years old. The motion was denied. Graham then moved to suppress the admission of his written statements prior to trial. After a hearing, the motion was denied.

## II. Mental Health Professional–Patient Privilege

Graham challenges the admission of statements he made to a social worker

---

**3.** The statement initially read, "I sex abuse one and beat the other to death." Patterson asked Graham what he meant by "beat the other to death." Graham denied killing any-

one. From this conversation, Patterson was satisfied that Graham was merely using hyperbole in saying he "beat the other to death." The statement was redacted for trial.

when he sought entrance to a homeless shelter. Graham claims the statements fall under the mental health professional-patient privilege of D.C.Code § 14–307(a) (1995 Repl.), and that the trial court erred in applying "the interests of public justice" exception under D.C.Code § 14–307(b)(1) (1995 Repl.). Specifically, Graham asserts that in applying this exception, the trial court should have engaged in a balancing test and determined whether an element of compulsion existed in his interview with Patterson, in violation of the Fifth Amendment.

The government disputes that Patterson qualifies as a mental health care professional for the purpose of applying the privilege. The government further argues that the information was not "acquired in attending a client in a professional capacity and that was necessary to enable [Patterson] to act in that capacity." D.C.Code § 14–307(a). Specifically, the government claims that the information did not relate "to the diagnosis or treatment of a client's mental or emotional condition," and thereby was not mental health information as defined by D.C.Code § 6–2001(9)(B) (1995 Repl.). In any case, the government argues that the testimony by the mental health care provider was admissible under the statutory exception to the privilege.

## A. Application of the Privilege

Initially, we must determine whether the statements are privileged under D.C.Code § 14–307(a). The statute states:

> In the . . . District of Columbia courts a physician or surgeon or mental health professional as defined by the District of Columbia Mental Health Information Act of 1978 (D.C.Code, sec. 6–2001 et seq.) may not be permitted, without the

consent of the person afflicted, or of his legal representative, to disclose any information, confidential in its nature, that he has acquired in attending a client in a professional capacity and that was necessary to enable him to act in that capacity, whether the information was obtained from the client or from his family or from the person or persons in charge of him.

D.C.Code § 14–307(a). A mental health professional includes "[a] licensed social worker," D.C.Code § 6–2001(11)(C) (1995 Repl.), and "[a]ny person reasonably believed by the client to be a mental health professional within the meaning of subparagraphs (A) through (F) . . . ." D.C.Code § 6–2001(11)(G) (1995 Repl.).[4]

In this case, Graham appeared in court as a result of a request for a restraining order made by T.G.'s mother, and discovered that T.G. was accusing him of sexual abuse. After the hearing, Graham went to a homeless shelter, where he was required to speak with Raymond Patterson, a social worker, and discuss the reasons he came to the shelter. Patterson was a social worker with Health Care for the Homeless. His job was to provide social services to people who came to this clinic. It was during an interview with Patterson that Graham wrote the statements wherein he admitted to abusing T.G. sexually.

The government's claim that Graham failed to show Patterson was a *licensed* social worker is not controlling. The statute includes not only licensed social workers, but also those "reasonably believed by the client" to be a licensed social worker. D.C.Code § 6–2001(11)(G). The record shows that Patterson did provide health care services to the homeless. Under these circumstances, Graham could have

4. Those categories include:

    (A) A person licensed to practice medicine;

    (B) A person licensed to practice psychology;

    (C) A licensed social worker;

    (D) A professional marriage, family, or child counselor;

    (E) A rape crisis or sexual abuse counselor who has undergone at least 40 hours of training and is under the supervision of a licensed social worker, nurse, psychiatrist, psychologist, or psychotherapist;

    (F) A licensed nurse who is a professional psychiatric nurse . . . .

D.C.Code § 6–2001(11) (1996 Repl.).

reasonably believed Patterson was a licensed social worker. Additionally, the government argues that the information was not obtained in order to allow Patterson to diagnose and treat Graham's mental health problem. We will assume for purposes of discussion, but do not decide, that the statements made by Graham fall into the mental health professional-patient privilege as defined by D.C.Code § 14–307(a).

## B. Exception to the Privilege

The government asserts that even if the information was privileged under D.C.Code § 14–307(a), the judge appropriately applied "the interests of public justice" exception which specifically excludes from the privilege "evidence in a criminal case where the accused is charged with causing the death of, or inflicting injuries upon, a human being, and the disclosure is required in the interests of public justice." D.C.Code § 14–307(b)(1)(1995 Repl.). The government notes that Graham was charged with rape and unlawful carnal knowledge, which is an injury to a human being. The only question remaining for this court, therefore, is whether "disclosure is required in the interests of public justice." D.C.Code § 14–307(a).

The Superior Court of the District of Columbia has addressed the issue of applying the "interests of public justice" exception. *See In re T.M., Jr.,* 120 Daily Wash. L. Rptr. 2541 (D.C.Super.Ct. Dec. 1, 1992). *In re T.M.* involved a defendant charged with carnal knowledge, sodomy, and indecent acts on a minor child. The defendant filed a subpoena duces tecum in order to obtain records from a rape counselling center which was treating the victim. *Id.* at 2541. In addressing the exception, the court employed a balancing test:

> The issue of what mental health records should be made available to the defense pits two strong societal interests against each other. One is the interest in insuring that those accused of criminal acts receive a fair trial. The other is the

interest in insuring that persons with mental health problems can seek treatment without fear of disclosure of statements made during the course of that treatment.

*Id.* at 2546. Finding that the interest of accommodating those who wish to seek mental health treatment was "particularly strong" in that case, *id.,* the court denied the defendant's request. *Id.* at 2547.

■ We approve the use of a balancing test when applying the "interests of public justice" exception. Such a test should consider the interest of encouraging those with mental health problems to seek treatment, but it should also consider other societal interests such as the right to a fair trial. Specifically, this case involves another compelling public interest: the protection of children from abuse. For example, this court has held that it was proper to admit testimony from mental health professionals in a child neglect proceeding, despite the existence of the privilege. *In re N.H.,* 569 A.2d 1179, 1183–84 (D.C. 1990). Further, in *(Michael) Johnson v. United States,* 616 A.2d 1216, 1224–25 (D.C.1992), *cert. denied,* 507 U.S. 996, 113 S.Ct. 1611, 123 L.Ed.2d 172 (1993), this court held that the marital privilege did not prevent a spouse from testifying against her common law husband when the husband was charged with the involuntary manslaughter of, and cruelty to the couple's eight month old daughter. Clearly, then, when a case involves the issue of the safety and welfare of children this court is more willing to find an exception to evidentiary privileges.

Consistent with this public interest, D.C.Code § 2–1352(a) (1994 Repl.) requires certain persons to report known or suspected child abuse:

> Notwithstanding § 14–307, any person specified in subsection (b) of this section who knows or has reasonable cause to suspect that a child known to him or her in his or her professional capacity has been or is in immediate danger of being a mentally or physically abused or ne-

glected child, as defined by § 16–2301(9), shall immediately report or have a report made of such knowledge or suspicion to either the Metropolitan Police Department of the District of Columbia or the Child Protection Services Division of the Department of Human Services.

D.C.Code § 2–1352(a). Among those required to make such report is a "social service worker." D.C.Code § 2–1352(b) (1994 Repl.).

With respect to child neglect proceedings, D.C.Code § 2–1355 (1994 Repl.) creates an exception to both the spousal privilege and the physician-patient privilege "in any proceeding in the Family Division of the Superior Court of the District of Columbia concerning the welfare of a neglected child" when a judge finds that the privilege "should be waived in the interest of justice." In one child neglect proceeding, the trial court invoked this exception and waived the mother's physician-patient privilege in order to allow a psychiatrist and psychologist, who were performing an examination of the mother pursuant to a court order prior to the neglect proceeding, to review the records of the mother's past mental health treatment. *In re O.L.*, 584 A.2d 1230, 1231 (D.C.1990). Relying in part on these evaluations, the trial court adjudicated the child neglected. *Id.* This court affirmed the trial court's construction of D.C.Code § 2–1355. *Id.* at 1232. In doing so, we noted that D.C.Code § 2–1352(a) requires the reporting of "suspected cases of neglect or abuse to the appropriate District of Columbia agencies" and stated that "[i]t taxes logic" to conclude that information for which D.C.Code § 2–

1352(a) authorizes disclosure could not also be used in a child neglect proceeding. *Id.* (quoting *In re N.H., supra,* 569 A.2d at 1183 n. 7) (footnote omitted).

In a criminal case, this court has observed, "Although there are distinctions between the civil context of proceedings to determine whether a child has been abused or neglected and the criminal context at issue in the instant case, the public policies are complementary." *(Michael) Johnson, supra,* 616 A.2d at 1224. We concluded that "the public interest in protecting children is served by prosecuting a father who kills his child." *Id.* In that case, this court affirmed a decision by the trial court to admit into evidence statements the defendant made to his common law wife concerning his belief that he would be arrested for beating his daughter. *Id.* at 1219. This court held that where the legislature created a specific exception to the marital privilege in neglect proceedings, but not a specific exception in criminal proceedings, an exception to the privilege in criminal proceedings existed nonetheless.[5] *Id.* at 1224.

■ This case involves the rape and sexual abuse of a minor. As such, it invokes the public interest in protecting children from abuse. In much the same way as "the public interest in protecting children is served by prosecuting a father who kills his child," *id.,* the public interest in protecting children is served by prosecuting those who sexually molest children. Considering this vital public interest, we therefore hold that when a mental health provider has made a report to District authorities of suspected child abuse, the

---

**5.** The state of Indiana has a similar statutory scheme. By statute, Indiana has a health care provider-patient privilege. IND. CODE 34–1–14–5 (1993). Indiana also requires "any individual who has reason to believe that a child is a victim of child abuse or neglect" to make a report. IND. CODE 31–6–11–3 (1993). There is a tension, therefore, between the privilege and the duty to report. Indiana addressed this issue in a statute to abrogate the health care provider-patient privilege where the health care provider has reason to believe a child may be the victim of abuse or neglect and reports this to authorities. IND. CODE 31–6–11–8(2) (1993). Thus, in Indiana, the health care provider-patient privilege will not act as a bar on the admission of evidence when the health care provider has made a report of suspected child abuse or neglect. *Id.; Hayes v. State,* 667 N.E.2d 222, 224–25 (Ind.Ct.App.1996).

trial court may, in its discretion, admit into evidence testimony from that mental health provider as an exception to the mental health provider-patient privilege pursuant to D.C.Code § 14–307(b)(1). Under these circumstances, the trial court did not abuse its discretion because appellant's interest in seeking mental health was limited at the most, and the interest in public justice is strong, particularly because of the protracted nature of the abuse.

## C. Alleged Compulsion

■ Graham argues that the trial judge erred in admitting the statements given to Patterson without considering whether sufficient compulsion existed to amount to a violation of his Fifth Amendment privilege against self-incrimination. Without reaching an opinion as to whether the balancing test concerning "the interests of public justice" exception necessarily involves a consideration of whether an element of compulsion exists, we conclude Graham's argument fails because no such compulsion existed in this case.

In determining that no compulsion existed, we examine three Supreme Court precedents. In *Oregon v. Mathiason*, 429 U.S. 492, 493, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), a police officer asked Mathiason, who was suspected of burglary, if he could meet with the officer at the police station. Mathiason voluntarily came to the station, and was told that he was not under arrest. *Id.* In this interview, Mathiason confessed. *Id.* The Supreme Court held that this was not a custodial interrogation because there was no indication that Mathiason's "freedom to depart was restricted in any way." *Id.* at 495, 97 S.Ct. 711.

In *Estelle v. Smith*, 451 U.S. 454, 456–57, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), a defendant in a murder trial was ordered by the trial court to undergo psychiatric evaluation in order to determine if he was fit to stand trial. Once convicted, the same psychiatrist who examined the defendant before trial testified against him. *Id.* at 458–60, 101 S.Ct. 1866. The Court held that "[a] criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id.* at 468, 101 S.Ct. 1866.

In *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 285–88, 118 S.Ct. 1244, 140 L.Ed.2d 387 (1998),[6] the Supreme Court held that an inmate's voluntary participation in a clemency hearing did not constitute a compulsion under the Fifth Amendment. This was true despite the fact that Ohio guaranteed only one clemency hearing, and silence on certain questions could be used against the prisoner. *Id.* at 286, 118 S.Ct. 1244. The Court specifically stated, "It is difficult to see how a voluntary interview could 'compel' respondent to speak." *Id.*

*Estelle* can be distinguished from both *Mathiason* and *Woodard* in that the latter two cases involved an interview that was voluntary. By contrast, *Estelle* involved a court-ordered evaluation. Thus, while the defendants in *Mathiason* and *Woodard* were not *compelled* to speak, the defendant in *Estelle* was so compelled.

The case of *State v. Smith*, 933 S.W.2d 450 (Tenn.1996), presents issues very similar to this case. There, the defendant engaged in inappropriate sexual contact with his stepdaughter. *Id.* at 452. After the defendant informed his wife, the two voluntarily reported the incident to the Tennessee Department of Human Services, who suggested the defendant seek counseling. *Id.* The defendant sought counseling, and admitted his transgressions to a counselor. *Id.* at 453. The counselor testified against the defendant in

---

**6.** The case produced several opinions, with the lead opinion written by Chief Justice Rehnquist. Parts of his opinion did not receive approval from a majority of the justices. Section III of Rehnquist's opinion, 523 U.S. at 285–88, 118 S.Ct. 1244, however, was unanimously approved by the Court.

a subsequent trial. *Id.* The court found that the defendant was not in custody because he was free to leave each counseling session; therefore, the admission of the counselor's testimony did not violate the defendant's right against self-incrimination. *Id.* at 454. Further, the court held that the suggestion that the defendant seek counseling did not amount to a compulsion to admit his wrongs. *Id.* at 456.

In this case, the evidence presented both at the suppression hearing and during trial demonstrates that Graham was not compelled to incriminate himself. Graham went to the shelter on his own volition. As such, it was a voluntary act. The record is devoid of any evidence to show Graham was not free to depart from the interview at any time.

Graham urges this court to find compulsion because he was seeking admission to a homeless shelter in Northwest Washington. Graham argues that he was required to speak with Patterson in order to be allowed to stay at the shelter. This, however, does not defeat the voluntariness of his conduct. Graham was still free to leave at any time. Indeed, Graham testified that on the night of March 27th, two days before speaking with Patterson, he did stay at a different homeless shelter in Northeast Washington. Further, there is no evidence on the record that Graham actually would have been denied access to the shelter if he had not complied with the interview.

In this instance, the homeless shelter did more than just provide a bed in which to sleep. The shelter sought to provide to those seeking refuge any special health care they may have needed. So, the shelter required information. In order to fulfill its role, then, the shelter may have needed to ask questions that could tend to incriminate those who seek shelter. Because these questions were relevant to the shelter's responsibilities, and because the questions were not being asked in conjunc-

tion with a specific threat of criminal prosecution, no Fifth Amendment violation occurred. *Asherman v. Meachum,* 957 F.2d 978, 982 (2d Cir.1992).

### III. "Other Crimes" Evidence

■ Graham next claims the trial court erred in admitting evidence of "other crimes" in violation of *Drew v. United States,* 118 U.S.App. D.C. 11, 15, 331 F.2d 85, 89 (1964).[7] Graham claims that (1) he was unfairly prejudiced by the evidence; and (2) the government failed to show to the trial court that the crimes occurred by clear and convincing evidence as required by *Flores v. United States,* 698 A.2d 474, 482 (D.C.1997).

This court held in *Pounds v. United States,* 529 A.2d 791, 794 (D.C.1987), that "in prosecutions for sexual offenses, evidence of a history of sexual abuse of the complainant by the defendant may be admissible on the theory of predisposition to gratify special desires with that particular victim." Among the factors that the court considered in leading to this conclusion was that such sexual abuse involves the same parties, and shows a continuous course of conduct beginning when the complainant was very young. *Id.* And accordingly, said the court, "[t]he circumstances are somewhat akin to those situations where we have found that the evidence was inextricably interwoven with the crime and therefore not *Drew* evidence." *Id.* at 795 (citing *Toliver v. United States,* 468 A.2d 958, 960 (D.C.1983)). Graham's claim that the evidence was inadmissible, then, is meritless.

### IV. Insufficiency of the Evidence

Citing assertedly contradictory testimony of T.G., Graham claims the evidence was insufficient to support a conviction. Specifically, Graham cites to portions of T.G.'s testimony where she appears to contradict herself on whether actual penetration occurred.

7. Specifically, Graham refers to uncharged acts of sexual abuse from age five to age thirteen, and uncharged acts of vaginal intercourse from the age of thirteen forward.

Penetration is an essential element of the crime of carnal knowledge. *In re J.W.Y.*, 363 A.2d 674, 678 n. 1 (D.C. 1976); *Williams v. United States*, 357 A.2d 865, 867 (D.C.1976). "[T]he slightest penetration," however, "is sufficient to sustain a conviction . . . ." *In re J.W.Y., supra,* 363 A.2d at 678 n. 1.[8]

An appellate court must be cautious "[s]o as not to displace the role of the jury . . . ." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987). So, a motion for a judgment of acquittal must be granted where the evidence "is such that a reasonable juror *must* have a reasonable doubt as to the existence of any of the essential elements of the crime." *Id.* "As is true with any witness, a child's testimony at times may be inconsistent or confused; and just as with any witness, such confusion or inconsistency will weigh in the jury's determination of credibility." *Barrera v. United States,* 599 A.2d 1119, 1125 (D.C.1991).

In this instance, T.G. first testified on direct examination that penetration occurred. Later, on cross-examination, T.G. appeared to testify that actual penetration had not occurred. That her testimony may have appeared inconsistent or contradictory is not enough to reverse the conviction, as such considerations are best left to the jury for determining credibility. *See id.* Further, the jury could of course consider the statements made by Graham admitting to his misconduct. Sufficient evidence existed on the record to support this conviction.

Accordingly the judgment of conviction is

*Affirmed.*

---

8. "Although penetration of the victim's sexual organs is an essential element of the crime of carnal knowledge, the government need not prove full penetration since the offense is committed if the male organ enters only the labia of the female organs." *Williams, supra,* 357 A.2d at 867.