# District of Columbia
# Court of Appeals

**No. 14-CF-297**

ENRIQUE MENENDEZ,

                     Appellant,

    v.

UNITED STATES,

                     Appellee.



**CF1-13583-11**

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE:   GLICKMAN and THOMPSON, *Associate Judges*; and REID, *Senior Judge.*

## J U D G M E N T

This case came to be heard on the transcript of record and the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the judgment of the trial court is affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: March 2, 2017.

Opinion by Senior Judge Inez Smith Reid.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 14-CF-297

ENRIQUE MENENDEZ, APPELLANT,

v.

UNITED STATES, APPELLEE.

FILED  **3/2/17**
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

Appeal from the Superior Court of the
District of Columbia
(CF1-13583-11)

(Hon. Russell F. Canan, Trial Judge)

(Argued May 17, 2016                                          Decided March 2, 2017)

*Fleming Terrell*, Public Defender Service, with whom *Samia Fam*, and *James Klein*, were on the brief, for appellant.

*Stephen F. Rickard*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, and *Lindsay Suttenberg*, Assistant United States Attorneys, were on the brief for appellee.

Before GLICKMAN and THOMPSON, *Associate Judges*, and REID, *Senior Judge*.

REID, *Senior Judge*:  A jury found appellant, Enrique Menendez, guilty of first-degree child sexual abuse; the jury also responded to two questions on the verdict form, finding that at the time of the offense, (a) the victim was under the age

of twelve, and (b) the victim was under the age of eighteen and "[Mr.] Menendez had a significant relationship to [the victim] in that [Mr.] Menendez was [the victim's] uncle." Mr. Menendez argues on appeal that (1) the amount of uncharged abuse evidence introduced at trial far exceeded that allowed in this jurisdiction as context for the charged crime, and (2) the government violated his constitutional due process rights by failing to disclose the bias of an important witness.[1] For the reasons stated below, we affirm the judgment of the trial court.

**FACTUAL SUMMARY**

The record shows that Mr. Menendez was indicted on one count of child sexual abuse (penetration of the anus), with aggravating circumstances; the sexual act occurred in the Northwest quadrant of the District of Columbia, sometime

---

[1] This second issue – involving the circumstances of government witness D.T.'s appearance at trial, cross-examination for bias, and the government's alleged failure to disclose material evidence favorable to Mr. Menendez under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) – is presented for the first time on appeal. Mr. Menendez asserts that "[t]he defense did not learn of the material witness warrant or the detention of D.T.'s father" until sealed ex parte bench conferences and a sealed bench warrant application "were unsealed for review in the preparation of this appeal." Because the record is insufficient for appellate review of the *Brady* claim, we decline to consider this second issue until after a D.C. Code § 23-110 motion has been filed in the trial court and a suitable record has been compiled for appellate review.

between January 1, 2009 and May 16, 2009. The victim was Mr. Menendez's nephew, C.G. C.G. was born in February 1999. To prove the charge against Mr. Menendez, the government called several witnesses.

C.G. was the primary government witness. Prior to the incarceration of his father, C.G. lived in Germantown, Maryland with his father, his mother (Kristeen), his younger brother (Z.), and his mother's middle sister (Sharon). When C.G.'s mother and aunt no longer could afford the residence in Germantown after C.G.'s father was incarcerated, they moved to the Laurel, Maryland home of their oldest sister (Kathryn) and her husband, Mr. Menendez. Also occupying the Menendez home were Kathryn's two minor sons – D. and J.; D. is Mr. Menendez's son, and J. is his stepson. Mr. Menendez, his wife, and their son D. slept in one bedroom; Sharon and J. shared a bunk bed in another bedroom; and C.G., his mother, and his brother slept on a mattress in the living room. Mr. Menendez worked at an optical shop in the District of Columbia.

During his testimony, C.G. first related earlier acts of uncharged sexual abuse that took place in Maryland. Mr. Menendez began performing sexual acts against C.G. at his Laurel, Maryland home – in the living room, Mr. Menendez's bedroom,

the bathroom, the back yard, the kitchen, and J.'s bedroom. In the living room incident, C.G. was alone, had on boxer shorts and a tank top, and was in bed, with the lights off. His mother was at work, his brother was in the room that his aunt Sharon shared with J., and his aunt Kathryn was asleep in her room. His uncle came into the living room, "pulled [C.G.'s] body up into a bending-over position and took off [C.G.'s] clothes." C.G. felt Mr. Menendez's private part enter into "his butt." Mr. Menendez was moaning, groaning, and moving; he moaned the loudest before releasing C.G. C.G. "felt like something in his butt was bleeding." He went to the bathroom to see if he was bleeding but detected no blood. He did not tell his mother or anyone else what had happened because he was "scared and confused [and] didn't know what to do." Mr. Menendez "was like a father figure to [his] cousin [J.] and [C.G.] didn't want [J.] to lose that."

Mr. Menendez performed other sex acts on C.G. in the bedroom that he and his wife shared. These acts happened while other members of the family were out shopping. Mr. Menendez would play DVDs of people engaging in sex acts such as the one he performed on C.G. in the living room. He would tell C.G. to touch himself; Mr. Menendez would touch himself and then anally penetrate C.G. while the sex DVD was playing. When he engaged in the sex act, Mr. Menendez would

wear a black object, "with silver like circles around it"; it had the shape of a ring. "[P]arts of it felt like metal" . . . , and it was like leathery, and then like the little circles around it were metal." Mr. Menendez would put a yellow object on C.G.'s private part that had "a jelly-ish feeling."

C.G. recalled that Mr. Menendez had him perform oral sex twice, once in the bathroom. To perform oral sex the second time, Mr. Menendez awoke C.G., and took him to the backyard while everyone else was asleep. After oral sex, Mr. Menendez removed C.G.'s clothing and anally penetrated him. While C.G. was in the kitchen on one occasion, and while he was in J.'s bedroom on another occasion, Mr. Menendez touched himself. He told C.G. to block the door so no one would come in. As Mr. Menendez touched himself, he moaned and ultimately said, "fire in the hole; semen is coming." Mr. Menendez thanked C.G. for blocking the door and then left the room.

After the sex acts, Mr. Menendez would ask C.G. if he liked it. He instructed C.G. not to tell anyone or he, Mr. Menendez, would get into trouble. C.G. interpreted the statement to mean that Mr. Menendez would go to jail.

When C.G. was in the fourth grade, he had a friend named D.T. who lived in Maryland. While C.G. was sleeping over at D.T.'s home, Mr. Menendez called C.G. on C.G.'s cell phone. D.T. and D.T.'s brother heard Mr. Menendez tell C.G. to go to the bathroom, put Vaseline on his private part, and "put it in D.'s butt." The boys laughed. C.G. laughed because he "didn't want to like show like (sic) [he] was scared," because he "didn't know what to do."

Before C.G. related what occurred during the sex act in the District of Columbia, the trial court ruled that the prosecutor could ask C.G. about two poems he wrote – "I Hurt" and "Life Has No Meaning." Mr. Menendez's trial counsel moved for a mistrial. He argued that "'other crimes' evidence has overwhelmed this trial in a more prejudicial than probative way," and that "[i]t has been completely unfair." The trial court denied the motion, and C.G. responded to questions about the incident that happened in the District.

C.G. also was in the fourth grade when the charged incident occurred. On the day of the incident, Mr. Menendez drove family members to C.G.'s grandmother's house. On the way there, C.G. fell asleep. When he awoke, he was alone in the van with Mr. Menendez. Mr. Menendez drove to the optical office

where he worked; he went there to make eyeglasses for one of his sons.[2] He took C.G. to a small room with a big chair and another chair that was black and circular. He closed the door, removed C.G.'s pants and underwear, and he took off one leg of his own jean overalls and lowered the other to his ankle. Mr. Menendez sat on the big chair and instructed C.G. to bend over. He put his private part inside C.G.'s butt, began moving his hips, told C.G. to hold onto the black circular chair to support his stomach, began moaning, and after an "extra loud" moan, he stopped. He asked C.G. if he "liked it." C.G. did not answer. C.G. did not tell anyone about the incident because "he was scared [and] confused" and he "didn't know what to do." Eventually he told his mother about the incident, but she "didn't believe [him] at first, because [he] said it out of anger." After Mr. Menendez put C.G., his mother, Aunt Sharon, and his brother out of his home because he was angry with C.G., C.G. again told his mother about the incident, and later spoke with the police.

At the end of his direct testimony, C.G. identified the notebook containing the poems he had written. He wrote the poems when he was in the fourth grade. He read the poems before the jury. The poem, "I Hurt," stated: "When I get mad, I

---

[2] Roberto Conte managed the optical office where Mr. Menendez worked. He testified that Mr. Menendez had a key to the office, sold glasses and frames, and fabricated lenses.

keep it inside, but sometimes I just push it aside. One day I kept the hurt inside. I hate the hurt." The second poem, "Life Has No Meaning," said: "[I]t just makes you mad. Some people kill themselves because they're so sad. I think of doing that sometimes in my mind, but I push back, so it's hard to find. Life has no meaning." C.G. did not remember exactly why he wrote the poems, but he "was feeling sad, so [he] had to let something out, and wrote [the poems]." He did not feel that way before he moved into Mr. Menendez's home.

The government presented other witnesses. D.T., who knew C.G. in the fourth grade, testified that C.G. told him that Mr. Menendez had "raped" him. He admitted on cross-examination that he told the grand jury that C.G. said Mr. Menendez was "touching him," but he explained on redirect examination that when he said "raped" he meant "touched," that "basically . . . rape mean[s]" touching. D.T. remembered that during a sleepover at D.T.'s home, C.G. received a call on his cell phone. C.G. put the call on the speaker. D.T. heard a male voice telling C.G. to put Vaseline on his butt.

Sharon, who took care of the children who resided in the Laurel home, recounted an experience she had upon entering the living room where C.G., his

mother, and brother Z. slept. C.G.'s mother was out late so Sharon had taken Z. to her bedroom. C.G. was on the mattress when she left. When Z. fell asleep, she went to return Z. to the living room. The light was off and she did not turn it on. She "kind of felt something" when she tried to put Z. on the mattress. She said, "oops," and "heard [Mr. Menendez] say, just put Z. down." Sharon did not expect Mr. Menendez to be there, but he was on the mattress. Mr. Menendez got up and went to the backyard. When he returned, he did not say anything to Sharon.

According to Sharon, the initial relationship between Mr. Menendez and C.G. was "really close" and C.G. "treated [Mr. Menendez] as his dad." However, one night Sharon observed that C.G. "was really, really mad" because Mr. Menendez "scolded him about something." C.G. "burst[] into tears and then said something." Sharon heard C.G. say, "he molested me." C.G. told his mother, who also was present at the time, that his father should not be incarcerated; rather "it should be" Mr. Menendez. When his mother asked why C.G. "was saying that," he replied, "because he molested me." C.G.'s relationship with Mr. Menendez changed. "[C.G.] would be really, really mad," and "he kept his distance" from Mr. Menendez. After C.G., Z., his mother, and aunt moved to the hotel, C.G. "became

better," and "little by little, he would open up to [his mother and aunt] and talk about" the molestation.

The government presented other relevant evidence. The Laurel City Police Department began a criminal investigation of C.G.'s situation. On May 28, 2009, Sgt. Erik Lynn, then assigned to the criminal investigation division of the Department, received a fax from Child Protective Services of Prince George's County regarding a child sexual assault of a ten-year old boy, C.G., at the hands of a forty-five-year old male, C.G.'s uncle – Mr. Menendez. Sgt. Lynn conducted a recorded interview with C.G. on June 8, 2009, in the presence of Stephanie Cook, an investigator with Child Protective Services. C.G. responded to routine questions with eye contact, but when he described what Mr. Menendez did, he avoided eye contact, "continuously looked at the ground," and played with his hair. The trial court ruled that the government could play the videotape of the interview in which C.G. identified Mr. Menendez as the person who performed the sexual acts about which he testified.

Sue Ellen Beckman, a nurse who formerly worked at the Sexual Assault Center at Prince George's County Hospital, saw C.G. on June 2, 2009. C.G. was "very withdrawn." He said his uncle put his private part in his (C.G.'s) butt.

After his interview with C.G., Sgt. Lynn contacted the Metropolitan Police Department in the District to report on the investigation of Mr. Menendez. In addition, on August 18, 2009, Sgt. Lynn participated in the execution of a search warrant at the Menendez home. The search produced electronic devices, pornographic flyers, a pillow, and a mattress cover.[3] Sgt. Donald Winstead of the Laurel Police Department also participated in the search of the Menendez home. Among the items he recovered from the basement of the home was a black rubber ring used by a male in the performance of sexual acts.

---

[3] Kathryn Busch, a forensic scientist in the biology unit of the Maryland State Police forensic sciences division, testified as an expert witness in the field of DNA analysis and serology. She received a piece of a mattress cover and a pillow. She also received DNA from Mr. Menendez, J., C.G., Mr. Menendez's wife, Sharon, and C.G.'s mother. A stain on the mattress cover revealed the presence of semen. Testing of the pillow produced negative results. Ms. Busch obtained a DNA profile from the mattress cover stain. She could not draw any conclusions about the minor contributor DNA profile. The minor contributor could have been "multiple" persons. However, she determined that "[t]o a reasonable degree of scientific certainty, the major contributor [was] [Mr.] Menendez."

In addition to claiming that a mistrial should be granted because the "other crimes" (uncharged) evidence was "overwhelming" and more prejudicial than probative, Mr. Menendez presented his case through the cross-examination of government witnesses, and through the testimony of Mr. Menendez's main witness, Edgar Ocon, who worked at the optical store with Mr. Menendez. The central defense theory was that C.G. fabricated the allegations against Mr. Menendez because of his deep-seated anger after Mr. Menendez banished C.G., his mother, and his aunt from the Menendez home.

Through the cross-examination of C.G. and Sharon, counsel for Mr. Menendez emphasized aspects of C.G.'s background to set the stage for the fabrication theory based on C.G.'s anger. These aspects included C.G.'s father's incarceration and transfer from a Virginia jail to a Louisiana prison, precluding visits by C.G.; C.G.'s family's homelessness; C.G.'s building anger over being scolded for misbehavior; and C.G.'s failure to report any abuse by Mr. Menendez until after Mr. Menendez told C.G., his mother, and his aunt to leave his home. Defense counsel also endeavored to establish that Sharon said C.G. complained about Mr. Menendez in Spring 2008, not in 2009; C.G. did not use the word "molest" when he complained about his uncle to Sharon; Sharon "didn't think anything of it" when she

encountered Mr. Menendez on the mattress where C.G. slept; and Sharon never saw Mr. Menendez touch C.G.

At the time of his testimony, Mr. Ocon had known Mr. Menendez for about eleven or twelve years. Mr. Menendez gave Mr. Ocon his first job and, subsequently, they became good friends. Mr. Ocon was present at the optical office on the day of the charged incident against Mr. Menendez. He arrived at the office before Mr. Menendez and C.G. Because Mr. Ocon was more specialized in rimless glasses than Mr. Menendez, he did the work. While the two men were in the work area, C.G. was in the lobby having fun. Mr. Ocon testified that he "had sight of [Mr. Menendez and C.G.] pretty much the whole time" they were in the optical office.

## THE PARTIES' ARGUMENTS REGARDING THE MARYLAND SEXUAL ABUSE EVIDENCE

Mr. Menendez contends that "[t]he prosecution presented far more evidence of the Maryland abuse than was necessary to provide a context to explain C.G.'s behavior during and after the [District of Columbia] assault." He claims that the prosecution could have achieved its goals of "providing background to explain [Mr.]

Menendez's sexual proclivity and why C.G. reacted as he did to the charged assault . . . by having C.G. testify about what happened in [the District of Columbia] and then asking him whether similar assaults had ever happened before, and generally to describe how long such abuse went on and why he reported it when he did and not sooner." He argues that his conviction should be reversed because "the overwhelming volume and inflammatory detail of the government's presentation on the Maryland allegations – especially when viewed against its spartan presentation of evidence on the charged incident – made for a much greater likelihood that the jury would convict [Mr.] Menendez, either on the impermissible presumption that because he had abused C.G. on other occasions, he must also have done so on the charged occasion . . ., or simply to punish [Mr.] Menendez for what he did in Maryland . . . ." Moreover, Mr. Menendez maintains, the jury's note during deliberations (asking "how much consideration should we give to alleged incidents that took place in Maryland") and before any instruction had been given on how to view that evidence, was followed by a verdict the next day.

The government contends that Mr. Menendez argued in the trial court "that the government should be required to prove *each* prior sexual assault by clear and convincing evidence and that the government would be unable to do so," but on

appeal makes an argument that "is inconsistent with the position [he] took before the trial court." The government argues that "[b]ecause [Mr. Menendez] urged the trial court to demand that the government produce substantial evidence of the Maryland offenses at trial, this [c]ourt should not now entertain any claim that too much such (sic) evidence was introduced," and that if this court does review the appellate claim, it should be for plain error.

The government further asserts that the Maryland evidence provided the context to an understanding of the charged sexual abuse in the District, and hence, was "pivotal" under this court's decision in *Koonce v. United States*, 993 A.2d 544 (D.C. 2010). The government asserts that it was "pivotal" and "essential" because (a) "the ongoing 'random' and repeated abuse would enable the government to dispel any negative inference associated with C.G.'s imprecise testimony"; (b) it "explained C.G.'s compliance with [Mr. Menendez's] commands at the time of the charged abuse"; (c) it "explained C.G.'s delayed reporting of the abuse"; (d) it "was important in explaining C.G.'s gradual change in behavior and increasing anger towards [Mr. Menendez]"; (e) given certain evidence such as that pertaining to the rubber ring used by Mr. Menendez in performing certain sexual acts, and that pertaining to D.T.'s testimony, it was "relevant to corroborate that [the] 'pivotal'

continuing course of abusive conduct actually occurred"; and (f) as permitted by case law, "it demonstrated [Mr. Menendez's] 'predisposition to gratify special desires with that particular victim,'" that is, C.G.

Finally, the government argues that the jury's note during deliberations "dispels any prejudice by showing that [it] recognized it had to decide only whether [Mr. Menendez] had committed the charged (District) offense while making limited use of the Maryland evidence." The government maintains that the trial court's "correct response" (stating, in part, "[y]ou may use this evidence only for the limited purpose of deciding whether it shows the defendant's predisposition to gratify special sexual desires with [C.G.] specifically, and to place the District of Columbia charge in an understandable context") "further dispelled any risk of unfair prejudice."

In his reply brief, Mr. Menendez contends that the claim now before this court was properly raised in the trial court, and that the issue should be reviewed for abuse of discretion, rather than not be considered or be reviewed for plain error. He argues that he raised the claim in his written opposition to the government's first motion in limine, and in his response to the government's supplemental motion. He

insists that the trial judge was aware of the issue on which he was being asked to rule – "Was *all* of the proffered Maryland evidence pivotal context for the charged assault and admissible under *Koonce*, as the prosecution argued, or only some or none of that evidence, as the defense argued?" Mr. Menendez asserts that "even if the issue had not been preserved pretrial, the trial court's refusal to grant a mistrial and failure to limit the subsequent presentation of the Maryland evidence after C.G.'s non-pivotal testimony about the uncharged abuse overwhelmed the trial[,] should be reviewed for abuse of discretion." He further claims that "[b]y challenging the Maryland evidence as not sufficiently reliable to be admitted, [he] was asserting his right to have it excluded in its entirety, not inviting the government to pile on even more of that evidence before the jury."

Mr. Menendez vigorously argues that the government failed to satisfy the *Koonce* factor that requires the uncharged evidence to be "pivotal to the prosecution's case because proof of context is required." The gravamen of his argument is that the admission of numerous graphic details about the alleged sexual acts in Maryland defeated *Koonce's* goal of "ensur[ing] that the prejudicial impact of [the prior abuse evidence] will not significantly outweigh [its] probative value." Mr. Menendez insists that "[a] few questions to C.G. about whether he had

experienced other similar assaults, when they occurred relative to the charged incident, and why he did not report them sooner would have struck the right balance of providing explanatory context for the charged incident while cabining the risk that the jury would convict on the impermissible basis of the Maryland abuse." He maintains that the trial court's error in allowing into evidence so much graphic detail about the Maryland abuse was not harmless, and that his conviction must be reversed under *Koonce*.

## ANALYSIS

### *Standard of Review*

"'We review a trial court's decision to admit or exclude evidence for abuse of discretion.'" *United States v. Morton*, 50 A.3d 476, 482 (D.C. 2012) (quoting *Riddick v. United States*, 995 A.2d 212, 216 (D.C. 2010)). "'[W]e recognize that the evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision.'" *Id*. (quoting *Johnson v. United States*, 683 A.2d 1087, 1095 (D.C. 1996) (en banc)). Moreover, "'[a] trial court has broad discretion

to make evidentiary rulings because of its familiarity with the details of the case and expertise in evidentiary matters.'" *Travers v. United States*, 124 A.3d 634, 639 (D.C. 2015) (quoting *Richardson v. United States*, 98 A.3d 178, 186 (D.C. 2014)). "In determining whether the trial court properly exercised its discretion, we consider *inter alia* whether the court 'failed to consider a relevant factor.'" *Morton*, *supra*, 50 A.3d at 482 (citation omitted).

### *Applicable Legal Principles*

In cases of a sexual nature, this jurisdiction has long recognized an exception to "the general rule that a person cannot be convicted of a specific crime by proof that he has committed other crimes."[4] *Dyson v. United States*, 97 A.2d 135, 137 (D.C. 1953). Relying on *Hodge v. United States*, 126 F.2d 849, 75 U.S. App. D.C. 332, *Dyson* recognized that because there is a probability that an "emotional predisposition or passion" of a sexual nature "will continue," "[e]vidence of prior [sexual] acts between the same parties is admissible . . . as showing a disposition to

---

[4] Early D.C. Circuit cases followed the general rule articulated in *Dyson*. *See Bracey v. United States*, 142 F.2d 85, 87, 79 U.S. App. D.C. 23, 25; *see also Drew v. United States*, 331 F.2d 85, 89, 118 U.S. App. D.C. 11, 15 ("[E]vidence of one crime is inadmissible to prove disposition to commit crime, from which the jury may infer that the defendant committed the crime charged.").

commit the act charged." *Id*. at 138; *see also Bracey*, *supra*, 142 F.2d at 88, 79 U.S. App. D.C. at 26.

The specific contours of the exception to the general rule in sexual abuse cases began to evolve in *Pounds v. United States*, 529 A.2d 791 (D.C. 1987) (per curiam).[5] This court declared that "in the circumstance of ongoing sexual abuse of the complainant by appellant, several factors combine to render the probative value of the evidence so high as to outweigh its potential for prejudice." *Id*. at 794 (citation omitted). The factors are: (1) "the evidence of sexual contact occurred between the same parties"; (2) "the contact was incestuous"; (3) "the contact involved continuing conduct, beginning when complainant was a very young child"; and (4) "knowledge of the contact was pivotal, in some degree, to a determination of innocence or guilt[,]" because "part of appellant's defense was that the story told by his daughter in the absence of certain physical manifestations, or an earlier complaint, was 'impossible.'" *Id*. This court affirmed the trial court's admission of "the evidence of prior bad conduct on the basis that it tended to show

---

[5] In *Pounds*, a father was convicted of rape, carnal knowledge, and incest. He had sexually abused his daughter beginning when she was six or seven years old. His wife, the mother of the girl, did not believe that the abuse had occurred. *Pounds*, *supra*, 529 A.2d at 793, 795 n.5.

'gratification,' *i.e.* 'the predisposition to gratify special desires with that particular victim'"; we concluded that without the evidence of the prior sexual acts, the child's "lack of hysteria or trauma" in reporting the later sexual abuse, and "her failure to inform her mother, would be difficult to understand without the context of facts showing longstanding abuse by her father." *Id*. at 795 (footnote omitted). Relying on *Toliver v. United States*, 468 A.2d 958, 960 (D.C. 1983), we determined that "[t]he circumstances [in *Pounds*] are somewhat akin to those situations where we have found that the evidence was inextricably interwoven with the crime and therefore not *Drew* evidence." *Id*. In *Graham v. United States*, 746 A.2d 289, 296 (D.C. 2000), we summarily applied *Pounds* and *Toliver* in a sexual abuse case where a girl had been sexually abused since age six by the man who lived with her mother (and whom she called her stepfather); we mentioned two of the factors in *Pounds* – the sexual abuse involved the same parties, and there was "a continuous course of conduct beginning when the complainant was very young."

This court further refined the narrow sexual abuse exception to the admission of propensity evidence in *Koonce v. United States*, 993 A.2d 544 (D.C. 2010). We held "that prior abuse evidence may be admitted under this narrow exception if (1) the sexual abuse involves a defendant and the same victim; (2) the relationship

between the alleged abuser and the victim constitutes or approximates a close familial connection; (3) the pattern of sexual abuse started when the victim was very young and occurred at reasonably short and regular intervals without meaningful interruption; and (4) the evidence is pivotal to the prosecution's case because proof of context is required." *Id*. at 556 (referencing *Pounds*, *supra*, 529 A.2d at 794). We added that "there must be clear and convincing evidence that the prior abuse occurred." *Id*. (citing *Groves v. United States*, 564 A.2d 372, 374 (D.C. 1989).)

### *Pretrial Rulings Regarding Prior Uncharged Acts of Sexual Abuse*

Prior to trial, the parties engaged in extensive motions pleading regarding the admissibility of Mr. Menendez's uncharged prior acts of sexual abuse of C.G.[6] In response to these pleadings, the initial trial judge held several hearings on the uncharged prior acts. On February 8, 2013, the trial court made preliminary findings on the admissibility of the uncharged acts. On June 7, 2013, the trial court found that the government had met the first three *Koonce* factors and that, assuming that the government's proffer was satisfied by clear and convincing evidence, the

---

[6] The initial trial judge, the Honorable Robert Morin, handled the pretrial hearings and decisions. The case was transferred to the Honorable Russell F. Canan for trial.

government also satisfied the fourth *Koonce* factor. The court considered the government's evidentiary proffer at hearings on June 28, November 15, and November 22, 2013. Subsequent to the court's ruling that uncharged prior acts of sexual abuse could be admitted at trial, Mr. Menendez filed a "motion to reconsider admissibility of defendant's other crimes and prior bad acts."

The trial court held a hearing on the reconsideration motion on December 2, 2013. The court was particularly concerned as to whether the government had expanded the uncharged conduct to include Mr. Menendez's acts with other children, because that would be "overwhelming the limited purpose" for which evidence of uncharged acts is used. The government indicated that its evidence would not include acts with other children. The trial court determined that the government's evidence of uncharged prior acts of sexual abuse was "much more limited in nature" and generally would be allowed to prove context with respect to C.G.'s reaction to the sexual abuse act in the District of Columbia. With respect to evidence pertaining to the ring used during the sexual acts, the court ruled it admissible because of its probative nature, subject to the government's proffer regarding its prejudicial effect.

***Discussion***

To determine whether the trial court abused its discretion by admitting prior uncharged acts of sexual abuse, we review this case from the backdrop of two of our precedents – *Koonce*, where we reversed appellant's conviction for first-degree child sexual abuse and remanded the case for a new trial because the *Koonce* factors were not met, and *Steward v. United States*, 6 A.3d 1268, 1274 (D.C. 2010), where we applied the *Koonce* factors and affirmed "the trial court's denial of [appellant's] motion for a judgment of acquittal and its admission of the evidence of [appellant's] prior sexual contact" with the child.

The appellant in *Koonce* was convicted of first-degree child sexual abuse (anal penetration) of his girlfriend's niece in 1999, in the District of Columbia. The trial court admitted evidence of an alleged earlier act of anal penetration of the child by appellant in 1996 or 1997, in Maryland. This court determined that (1) the relationship between appellant and the child was neither incestuous, "nor sufficiently familial to fall within the slightly expanded meaning" of "close familial connection; (2) the third *Koonce* factor was not met because the Maryland alleged incident occurred in 1996 or 1997 and the District of Columbia incident in 1999, and therefore, the Maryland incident was not "part of a continuing course of conduct"

because "[a] single incident followed by a break in conduct of as much as two or more years is not 'so persistently repeated at short intervals as to constitute virtually an unbroken series' of events"; and (3) the rationale for introducing evidence of the Maryland incident – "we need a starting point" – did not satisfy the fourth *Koonce* factor, that is, that the evidence was "pivotal" to the prosecution's case. *Id*. at 556-57.

In *Steward* we held "that the evidence of [appellant's] prior sexual contact with his [fifteen year-old stepdaughter] [fell] squarely within the parameters of our explication in *Koonce* of [the] narrow [sexual abuse] exception, and therefore the trial court did not abuse its discretion by admitting the evidence at trial." *Id*. at 1271. The first two *Koonce* factors were met because appellant, the child's mother, and the child had been living together for years at the time of the prior sexual abuse and "a sufficiently close familial relationship existed between" the child and appellant. *Steward*, *supra*, 6 A.3d at 1272. The third *Koonce* factor was met because the sexual abuse "began when [the child] was very young [eight or nine years old] and continued without meaningful interruption for years [until the child was fifteen years old]." *Id*. The fourth *Koonce* factor was satisfied because "without information about [appellant's] history of sexual contact with [the child], it

would be impossible to explain why [the child] felt the need to tell [others] about the [later sexual abuse]," and "the prosecution would not be able to prove [appellant's] intent to gratify his sexual desires . . . without establishing that [appellant] had a history of abusing [the child] for that very purpose." *Id*.

There is no doubt that this case involves Mr. Menendez's "emotional predisposition or passion" of a sexual nature, *Dyson*, *supra*, 97 A.3d at 138, and "ongoing sexual abuse" of C.G., *Pounds*, *supra*, 529 A.2d at 794. Hence, the *Koonce* factors apply.

The first *Koonce* factor, sexual contact between the same parties – Mr. Menendez, the defendant and abuser, and C.G., the victim and the abused – obviously is met in this case. With respect to the second factor concerning the relationship between Mr. Menendez and C.G., Mr. Menendez's relationship to C.G. was much closer than the boyfriend of the abused child's mother in *Koonce*. Indeed, it is at least as close as that between the stepfather and stepdaughter in *Steward*. Here, the trial court found that there was a close relationship between C.G. and his uncle by marriage because Mr. Menendez disciplined C.G. and acted as a father figure to C.G. Testimony at trial supports this finding, as well as the jury's

specific finding that at the time of the offense Mr. Menendez "had a significant relationship to [C.G.] in that [Mr.] Menendez was [C.G.'s] uncle." Trial testimony revealed that three sisters lived in Mr. Menendez's home: one his wife, another the mother of C.G., and a third sister who cared for the children in the household. Sharon testified that the initial relationship between Mr. Menendez and C.G. was "really close" and C.G. "treated [Mr. Menendez] as his dad"; Mr. Menendez also "scolded" C.G. when he thought C.G. did something wrong. Consequently, the record shows that the second *Koonce* factor was met because the sisters, together with their children or nephews, occupied the same home with Mr. Menendez, in a family setting; the relationship between Mr. Menendez and C.G. thus "approximate[d] a close familial connection." *See Koonce*, *supra*, 993 A.2d at 556.

The third *Koonce* factor – "the pattern of sex abuse started when the victim was very young and occurred at reasonably short and regular intervals without meaningful interruption" – also is satisfied in this case. *See id*. Unlike the situation in *Koonce*, there was no multi-year gap between Mr. Menendez's acts of sexual abuse in Maryland, and his act of sexual abuse in the District of Columbia. In fact, this case is akin to *Steward* where there was no meaningful interruption in appellant's sexual abuse of the victim. The jury here could reasonably conclude

that the sexual abuse of C.G. by Mr. Menendez occurred between early January 2009 and mid-May 2009, a discrete period of time.  Moreover, as in *Steward*, Mr. Menendez's pattern of abuse began when C.G. was very young.  Indeed, the jury specifically found that at the time of the offense C.G. was under the age of twelve.

Mr. Menendez has insisted throughout this case that the government failed to satisfy the fourth *Koonce* factor – "the evidence is pivotal to the prosecution's case because proof of context is required."  *See id*.  He claims that the Maryland evidence was "overwhelming" and the amount of that evidence far exceeded the amount allowed as context for a charged crime.

During the pretrial phase in this case the trial court carefully scrutinized the parties' pleadings and arguments, and the proffer pertaining to the fourth *Koonce* factor before concluding that the government's proof at trial would satisfy that factor.  Clearly this case is not like *Koonce* where the government's rationale regarding the fourth factor was that it "need[ed] a starting point" for introducing the evidence of sexual abuse relating to the charged offense.  *See id*. at 557 (internal quotation marks omitted).  The government took the position throughout the pretrial and trial proceedings in this case that the evidence of Mr. Menendez's

uncharged prior Maryland acts of sexual abuse against C.G. was essential because it served as context for the charged act of sexual abuse in the District of Columbia, to explain C.G.'s apparent lack of reaction or expressed concern, complaint or report of the abuse. The government also asserted that the evidence substantiated Mr. Menendez's intent to gratify his unusual sexual preference and desires. As the government argues on appeal, the Maryland evidence enabled the jurors to comprehend why C.G. simply complied with Mr. Menendez's instructions and actions of sexual abuse in the District "without surprise," delayed telling anyone about the acts of sexual abuse, became increasingly angry with Mr. Menendez's discipline, and was subjected to Mr. Menendez's efforts to convince him that the sexual acts he performed with C.G. were "normal" and that C.G. liked them. On this record where the trial court scrutinized and limited the evidence of the Maryland uncharged acts of sexual abuse, and properly instructed the jury in response to its question during deliberations about the limited purpose for which the Maryland evidence was introduced, we cannot say that the trial court erred or abused its discretion in ruling that the government's proffer and proof satisfied the fourth *Koonce* factor.[7]

---

[7] After review of the record, we agree with Mr. Menendez that the question of whether the trial court admitted too much evidence about the Maryland sexual

(continued…)

Beyond the four *Koonce* factors, Mr. Menendez contends that the trial court improperly concluded that the government presented clear and convincing evidence of Mr. Menendez's uncharged prior acts of sexual abuse against C.G. in Maryland. We disagree. The trial court paid particular attention to the clear and convincing standard during the pretrial proceedings before ruling that the Maryland evidence could be admitted.

To "determin[e] whether the government provided clear and convincing evidence [of Mr. Menendez's prior bad acts], the trial court was permitted to base its ruling on a detailed proffer from the government." *Medley v. United States*, 104 A.3d 115, 129 (D.C. 2014) (citing *Daniels v. United States*, 613 A.2d 342, 347 (D.C. 1992) (internal quotation marks omitted). At a hearing on June 28, 2013, the government proffered documents whose contents would establish Mr. Menendez's prior bad acts. In response, defense counsel argued that the government's proffer should be limited to documents reviewed by an administrative law judge ("ALJ") who found that C.G.'s allegations against Mr. Menendez about the Maryland sexual

(…continued)
abuse was properly preserved, and hence, the abuse of discretion standard applies.

abuse incidents were not substantiated.[8]   However, the trial court ruled that the

government was not limited to the ALJ's findings in making its clear and convincing

evidence proffer.   Consequently, the government identified the documents that

would constitute its proffer, and the trial judge gave defense counsel, as well as the

court itself, time to examine the documents.

On November 15, 2013, the trial court held a hearing on the clear and

convincing evidence requirement.   The trial judge indicated that he had examined

the contents of the following documents proffered by the government, some of

which were not seen or referenced by the ALJ:   (1) the June 9 (sic), 2009 Laurel

police interview of C.G.; (2) the June 16, 2009, interview between Sgt. Lynn and

Sharon regarding her discovery of Mr. Menendez in bed with C.G.; (3) the August

---

[8]   At a hearing on February 8, 2013, Mr. Menendez's trial counsel first mentioned an administrative hearing in Maryland by the Department of Social Services where the ALJ applied a preponderance of the evidence standard and the complaints against Mr. Menendez were found to be unsubstantiated.   In its supplemental motion in limine relating to Mr. Menendez's Maryland sexual acts against C.G., filed on March 26, 2013, the government identified the administrative hearing case as *Enrique Menendez v. Prince George's County Department of Social Services*.   The government further discussed the hearing, held on two days, May 19, 2011, and June 6, 2011.   At that hearing the ALJ heard telephone testimony from a social worker and testimony from Mr. Menendez and his wife.   However, there was no testimony from C.G., C.G.'s mother, the sexual assault nurse examiners, or other persons who occupied Mr. Menendez's home at the time of his sexual abuse of C.G.

17, 2009, Children's Advocacy Center interview with C.G.; (4) the August 18, 2009, Laurel police search warrant return; (5) the DNA report; and (6) the May 26, 2009, interview of C.G.'s mother, and her work records. The trial judge informed counsel that he had watched several hours of interviews between C.G. and the various interviewers and concluded that C.G.'s "description is generally consistent and detailed." The judge also referenced the government's supplemental motion in limine, to which Mr. Menendez filed an opposition. After listening to further arguments of defense counsel and the prosecutor, the trial court ruled that it was "satisfied that the government's proffer provides clear and convincing evidence, if the evidence supports the proffer, clear and convincing evidence of the existence of the other acts."

In light of the record of the trial court's careful and methodical examination of the government's detailed proffer, we conclude that the trial court properly ruled that the government's proffer satisfied the clear and convincing evidence standard. In addition, based on the trial testimony of C.G. and that of other government witnesses, reasonable jurors could conclude that C.G. was a credible witness in recounting the Maryland acts of sexual abuse despite his inability to recall precise dates of each abusive act, and that the government presented ample and compelling

evidence to convict Mr. Menendez beyond a reasonable doubt of the charge against him. Further, it was the jury's responsibility to weigh the testimony and evidence presented by both the government and defense, and the jury also was responsible for determining the credibility of all of the witnesses. After review of the record in this case, we are satisfied that there was no trial court abuse of discretion with respect to the clear and convincing standard of proof.

Mr. Menendez also emphasizes his arguments at trial, especially those that accompanied his motion for a mistrial, that the prejudicial impact of the Maryland evidence substantially outweighed the probative value of that evidence. On this record, there is no doubt that the Maryland evidence, including that pertaining to the p-ring used by Mr. Menendez in anal sex with C.G., had probative value, as the trial court ruled during pretrial proceedings. To avoid undue prejudice, the trial court limited the Maryland evidence that could be presented, and the court spent substantial time ensuring that the evidence admitted satisfied the *Koonce* factors, as well as the clear and convincing evidence standard. Furthermore, in light of Mr. Menendez's defense theory – that C.G. fabricated the District of Columbia charge – and in light of the trial court's "'broad discretion to make evidentiary rulings because of its familiarity with the details of the case and expertise in evidentiary

matters,'" *Travers*, *supra*, 124 A.3d at 639 (citation omitted), we cannot say that the trial court abused its discretion in rejecting Mr. Menendez's arguments about the prejudicial effect of the uncharged Maryland prior acts of sexual abuse that the trial court admitted into evidence. To be sure, the details were not pretty, but the government was required to present clear and convincing proof that the Maryland sexual abuse actually took place. Moreover, the trial court's admission of the Maryland evidence at Mr. Menendez's trial fell squarely under the legal principle that where there is a probability that an "emotional predisposition or passion" of a sexual nature "will continue," "[e]vidence of prior [sexual] acts between the same parties is admissible . . . as showing a disposition to commit the act charged." *Dyson*, *supra*, 97 A.2d at 138.

In short, we hold that the trial court properly exercised its discretion, and considered all relevant factors, before admitting evidence of Mr. Menendez's prior acts of sexual abuse against C.G.; "'we owe a great degree of deference to its decision.'" *Morton*, *supra*, 50 A.3d at 482 (quoting *Johnson*, *supra*, 683 A.2d at 1095).

Accordingly, for the foregoing reasons, we affirm the trial court's judgment.

*So ordered.*